## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| JOSHUA RAWA, ELISABETH MARTIN, ROBERT RAVENCAMP, AMY WARD, CYNTHIA DAVIES, CHRISTOPHER ABBOTT, OWEN OLSON, JEANNIE A. GILCHRIST, ZACHARY SHOLAR, MATTHEW MYERS, JOHN W. BEARD, JR., and MICHAEL OVERSTREET on behalf of themselves, all others similarly situated, and the general public, <br><br> Plaintiffs, <br><br> v. <br><br> MONSANTO COMPANY, <br><br> Defendant. | Case No. 4:17-cv-01252-AGF <br><br> *Consolidated with Case No. 4:17-cv-02300* <br><br> **DEMAND FOR JURY TRIAL** |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Joshua Rawa, Elisabeth Martin, Robert Ravencamp, Amy Ward, Cynthia Davies, Christopher Abbott, Owen Olson, Jeannie A. Gilchrist, Zachary Sholar, Matthew Myers, John W. Beard, Jr., and Michael Overstreet, on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, bring this action against Monsanto Company and allege the following upon their personal knowledge or, where they lack personal knowledge, upon information and belief, including the investigation of their counsel.

## NATURE OF THE ACTION

1.     Monsanto is the manufacturer of the ubiquitous herbicide known as Roundup. Among other Roundup products, Monsanto manufactures, markets, and

- 1 -

sells Roundup Weed & Grass Killer Concentrate Plus ("Roundup Concentrate Plus") and Roundup Weed & Grass Killer Super Concentrate ("Roundup Super Concentrate," together with Roundup Concentrate Plus, the "Roundup Concentrates"). Unlike "Ready-to-Use" Roundup, the Roundup Concentrates are intended to be diluted with water prior to use.

2.      Since late 2012 or early 2013, Monsanto advertised the Roundup Concentrates as capable of making a certain number of gallons, and as effective at addressing specific applications. For example, prominently at the top of the container in bold white numbers on a red background, the 32 oz. size Roundup Concentrate Plus advertises it makes 10 gallons of Roundup, the 36.8 oz. size advertises it makes 12 gallons of Roundup, and the 64 oz. size advertises it makes 21 gallons of Roundup, as pictured below.

  

3.     These advertisements were false, however, because the Roundup Concentrates were in fact only capable of making *half* the number of gallons represented when diluted to the strength required for the uses advertised on the label of each product, such as around flower beds and trees, on driveways and walkways, and along fences. Thus, for example, the 32 oz. size Roundup Concentrate Plus makes only 5 ⅓ gallons of Roundup for the advertised uses (despite advertising 10 gallons), the 36.8 oz. size makes only 6 ⅛ gallons of Roundup (despite advertising 12 gallons), and the 64 oz. size makes only 10 ⅔ gallons of Roundup (despite advertising 21 gallons). The same holds true for all sizes and variations of the Roundup Concentrates—each makes only between approximately 50% (for Roundup Concentrate plus) or 60% (for Roundup Super Concentrate) of the amount promised.

4.     Plaintiffs bring this action to recover damages for themselves and other similarly-situated purchasers.

## JURISDICTION & VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act, because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a state different from Monsanto. In addition, more than two-thirds of the members of the class reside in states other than the state in which Monsanto is a citizen and in which this case is filed, and

therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply. The Court also has supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

6.     The Court has personal jurisdiction over Monsanto as a result of Monsanto's substantial, continuous and systematic contacts with the state and because Monsanto has purposely availed itself of the benefits and privileges of conducting business activities within the state.

7.     Venue is proper in this Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b) and (c), because Monsanto resides (*i.e.*, is subject to personal jurisdiction) in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## **PARTIES**

8.     Plaintiff Joshua Rawa is a resident of St. Louis, Missouri.

9.     Plaintiff Elisabeth Martin is a resident of Highland, California.

10.     Plaintiff Robert Ravencamp is a resident of Blue Springs, Missouri.

11.     Plaintiff Amy Ward is a resident of Shorewood, Illinois.

12.     Plaintiff Cynthia Davies is a resident of Marion, Kentucky.

13.     Plaintiff Christopher Abbott is a resident of Louisville, Kentucky.

14.     Plaintiff Owen Olson is a resident of Denver, Colorado.

15.     Plaintiff Jeannie A. Gilchrist is a resident of Goldsboro, North Carolina.

16.     Plaintiff Zachary Sholar is a resident of Pekin, Indiana.

17.     Plaintiff Matthew Myers is a resident and citizen of Alpharetta, Fulton County, Georgia.

18.     Plaintiff John W. Beard, Jr. is a resident of Hamilton County, Tennessee.

19.     Plaintiff Michael Overstreet is a resident of Philadelphia, Pennsylvania.

20.     Defendant Monsanto Company is a Delaware corporation with its principal place of business in St. Louis, Missouri.

## FACTS

21.     Monsanto is one of the world's largest agricultural companies, and has long been manufacturing and selling herbicides to control weeds. Monsanto's leading herbicide is called Roundup, whose active ingredient is called glyphosate. Monsanto first introduced Roundup in the mid-1970s for the agricultural community, and then in the mid-1980s for residential use. Roundup has been a dramatically successful product, and is one of the most widely-used herbicides in the world for residential use.

22.     Monsanto manufactures, markets, and sells Roundup in various formulations, including Roundup Ready-to-Use formulations, which are intended simply to be sprayed directly out of the bottle in which the product is purchased;

and concentrated versions of the Roundup, such as the Roundup Concentrates, which the purchaser must first dilute with water before using with a tank sprayer.

23.   Specifically, Monsanto manufactures, markets and sells Roundup Concentrate Plus in 32-, 36.8-, 40-, and 64-ounce bottles (as partially pictured in the introduction above), and Roundup Super Concentrate in 35.2-,  53.7-, 64-, and 128-ounce bottles, as partially pictured below.



24.   The principal display panel of each of the Roundup Concentrates prominently claims that that product "Makes Up to" a stated number of gallons, as follows.

| Product | Label Statement |
|---|---|
| Roundup Concentrate Plus 32 oz. (1 qt.) | "Makes Up to 10 Gallons" |
| Roundup Concentrate Plus 36.8 oz. | "Makes Up to 12 Gallons" |

- 6 -

| Product | Label Statement |
|---|---|
| Roundup Concentrate Plus 40 oz. | "Makes Up to 13 Gallons" |
| Roundup Concentrate Plus 64 oz. | "Makes Up to 21 Gallons" |
| Roundup Super Concentrate 35.2 oz. | "Makes Up to 23 Gallons" |
| Roundup Super Concentrate 53.7 oz. (0.42 gal.) | "Makes Up to 35 Gallons" |
| Roundup Super Concentrate 64 oz. (1/2 gal.) | "Makes Up to 42 Gallons" |
| Roundup Super Concentrate 128 oz. (1 gal.) | "Makes Up to 85 Gallons" |

25.     Directly under the Roundup name, each Roundup Concentrate label states "WEED & GRASS KILLER." Further, directly under the Roundup name and within a prominent geometric design with an eye-catching illustration, each Roundup Concentrate label also states claims the product "**KILLS** THE ROOTS GUARANTEED." A close-up of a Roundup Super Concentrate label illustrating these elements is depicted below.



26.     Given the price of the Roundup Concentrates in comparison to Ready-to-Use Roundup, together with the purported number of gallons each Roundup

Concentrate makes, Monsanto markets the Roundup Concentrates as better values than its Ready-to-Use products.

27.    A glossy several-page pamphlet is taped over the back label of each Roundup Concentrate bottle, with its front page showing a graphic providing information under three headings, "Where to Use," "What to Know," and "How to Use." The back of the bottle of the Roundup Super Concentrate and Roundup Concentrate Plus, respectively, with the taped pamphlet, is depicted below.



28.     Close-up exemplars of this graphic for Roundup Concentrate Plus, and

Roundup Super Concentrate, respectively, are depicted below.

Roundup Concentrate Plus



Roundup Super Concentrate



29.     As depicted above, the specific statements within each section of the

graphic are as follows:

How to Use

> • "Add 6 fl oz Per Gallon of Water" [Roundup Concentrate Plus]
>
> • "Add 2 1/2 fl oz Per Gallon of Water" [Roundup Super Concentrate]
>
> • "Use a Tank Sprayer"

Where to Use

> • "Along Fences"
>
> • "Driveways & Walkways"
>
> • "Around Trees"
>
> • "Around Flower Beds"

What to Know

> • "Rainproof in 30 Minutes"
>
> • "Visible Results in 12 Hours" [Roundup Concentrate Plus]
>
> • "Visible Results in 2 to 4 Days" [Roundup Super Concentrate]
>
> • "Plant 1 to 3 Days After Application (See booklet for details)"

30.     Given the dilutions set forth on the back panel of each Roundup Concentrate, the specified number of gallons that Monsanto represents the Roundup Concentrates are capable of making for the advertised uses is approximately *double* what they are actually capable of making when mixed with water according to Monsanto's own instructions. Thus, the Roundup Concentrates actually make about *half* the amount Monsanto claims, as demonstrated in the table below.

| Product | "Makes Up to" Gallon Promise | Back Label Instruction (Amount to Mix with 1 Gallon Water) | Amount Made Following Instructions |
|---|---|---|---|
| Concentrate Plus (32 oz.) | 10 gallons | 6 fl. oz. | 5.33 gallons |
| Concentrate Plus (36.8 oz.) | 12 gallons | 6 fl. oz. | 6.13 gallons |
| Concentrate Plus (40 oz.) | 13 gallons | 6 fl. oz. | 6.67 gallons |
| Concentrate Plus (64 oz.) | 21 gallons | 6 fl. oz. | 10.67 gallons |
| Super Concentrate (35.2 oz.) | 23 gallons | 2.5 fl. oz. | 14.08 gallons |
| Super Concentrate (53.7 oz.) | 35 gallons | 2.5 fl. oz. | 21.48 gallons |
| Super Concentrate (64 oz.) | 42 gallons | 2.5 fl. oz. | 25.6 gallons |
| Super Concentrate (128 oz.) | 85 gallons | 2.5 fl. oz. | 51.2 gallons |

31.     Sealed underneath the back-panel label page is the remainder of the pamphlet that also includes instructions for use.

32.     But the pamphlet as taped to the back label of the bottles is sealed tightly and only with careful effort is the pamphlet able to be removed and opened without being torn.

33.     As a result, most reasonable consumers would not feel permitted to unseal the pamphlet prior to purchase. Thus, the vast majority of purchasers do not rely on any of the information contained within the pamphlet, and would not even see that information, *prior* to purchase.

34.     Even for those who have already purchased the product and then succeeded in removing the pamphlet, generally they do not feel the need to review the instructions on several pages of fine print before actual use, particularly since they have already seen the easy-to-read diagram with mixing instructions on the cover of the pamphlet prior to purchase.

- 11 -

35.     And even for those who do read the remainder of the pamphlet after purchase, it is only through a careful review of this pamphlet, including noticing a buried "fine print" instruction, that the customer may see the inconsistent statement from Monsanto that accounts for the prominent misrepresentation that overstates the number of gallons made.

36.     As an example, two internal pages of the several-page pamphlet for the1/2 gallon Super Concentrate are depicted below:



37.     Notably, the pamphlet falsely restates, as the very first item under the heading, "PRODUCT FACTS - KILLS ALL TYPES OF WEEDS & GRASSES," that the product "Makes up to 42 Gallons." The pamphlet further falsely states, as

the first bullet under "Mixing Instructions," that, "For best results, add 2-1/2 fl oz (5 Tbs) to 1 gallon of water."

38.    Only when a purchaser reads further down into "Mixing Instructions" is the very first and only reference to the possibility of using a greater dilution, wherein it states "For easy to kill weeds such as seedlings, add 1-1/2 fl oz (3 Tbs) to 1 gallon of water."

39.    A reasonable purchaser – for example, an ordinary homeowner interested in removing weeds along a fence, on a driveway, or around trees or flower beds – does not have the professional understanding of what constitutes an "easy to kill weed," and does not have the technical expertise to discern when it would be appropriate to use less concentrate per this instruction.

40.    To the contrary, a reasonable consumer would instead rely on Monsanto's representation that "for best results, add 2-1/2 fl oz (5 Tbs) to 1 gallon of water," especially inasmuch as this is consistent with the prominent graphic on the product's rear panel (which is also the cover to the pamphlet), set forth adjacent to the product's advertised intended uses.

41.    Reasonable consumers read and understand "up to" representations – like the "Makes Up to" a specific number of "Gallons" representations on the Roundup Concentrates – as providing, under normal and reasonable conditions for use, the maximum results promised. Indeed, the U.S. Federal Trade Commission has explicitly determined this to be the case, stating that its "view" is "that

advertisers using these claims should be able to substantiate that consumers are likely to achieve the maximum results promised under normal circumstances."

42.     As demonstrated by the pamphlet itself, including its cover, use of the product only on "weeds such as seedlings" is not normal use. Rather, normal use is as represented on the pamphlet's cover, and of course on the front of the bottle: as a "WEED AND GRASS KILLER," that "KILLS ALL TYPES OF WEEDS & GRASSES," and is to be used "Along Fences," on "Driveways & Walkways," "Around Trees," and "Around Flower Beds," wherein the use is "GUARANTEED" to "KILL[] THE ROOTS."

43.     Reasonable consumers should not be expected to notice, and then engage in the math necessary to determine that, following the dilution instructions provided on the back of the label of each Roundup Concentrate, the product only makes half the amount stated prominently on the front.

44.     Moreover, even for the rare consumer that might engage in the math and notice the discrepancy, no explanation is provided except the single, small-print sentence buried in the pamphlet, and thus the labeling remains confusing, and at best ambiguous as to whether, and under what circumstances, the product "Makes Up to" the amount stated, and at what point the efficacy of the product becomes less than what the consumer believes it to be, or not efficacious at all.

## PLAINTIFFS' PURCHASES AND INJURIES

**A.**   **Joshua Rawa**

45.   In about 2015, Plaintiff Joshua Rawa purchased a bottle of Monsanto's Roundup Ready-to-Use herbicide for his personal use, at his residence, around and in the cracks in his cement driveway and around his landscaping. Because he had had run out of the Roundup Ready-to-Use bottle, he needed to purchase it again.

46.   As such, in about April or May 2016, he went to the Lowes location in Bridgeton, Missouri, where, in addition to the Ready-to-Use version of Roundup, he also saw other versions of Roundup, including Roundup Super Concentrate, which was being offered for about $50. He noticed that the top of the bottle stated that it "made up to 23 gallons," which he believed meant that it would make 23 gallons for normal use, including for such things as cement driveways and around landscaping for which he used the Ready-to-Use formulation the previous season. He also saw on the back of the Super Concentrate was the front page of a little pamphlet that was taped shut to the back of the bottle. Because it was taped shut, he did not tear open the pamphlet while looking at the product in the store, thinking that would be improper, and he also believed that, in any event, the pamphlet probably contained much information that he did not necessarily need to know in order to decide whether or not to purchase the product.

47.   Instead, what was important for him in order to make his purchasing decision was to what extent the Super Concentrate was a better price value than the

Ready-to-Use version for which he went to the store to begin with. Using his cell phone, he did some quick math, comparing the price-per-gallon of the promised 23 gallons of Roundup Super Concentrate to the price-per-gallon of the Ready-to-Use version. By doing so, he was able to determine that Roundup Super Concentrate provided a better value than Roundup Ready-to-Use. As a result, plaintiff purchased the Roundup Super Concentrate. In doing so, he relied on the statement that the product made 23 gallons, and the fact that the product therefore provided a substantially better price value than Ready-to-Use. Indeed, the better price value was the determining factor in plaintiff's decision to purchase Roundup Super Concentrate.

48.     Once home with the product, plaintiff followed the mixing instructions that were on the graphic page of the pamphlet taped shut on the back of the bottle. He never tore open the pamphlet taped to the back of the bottle, believing there was no need to do so since he knew the mixing instructions from the graphic for the same typical applications for which he used Ready-to-Use the previous season—for his cement driveway and around his landscaping. To use the product the first time, he followed the process of mixing the product with water consistent with the mixing instructions shown on the graphic taped to the back of the bottle, and he repeated this mixing process throughout the season.

49.     As the season progressed, plaintiff had the impression that the concentrate product did not work as well as the Ready-to-Use version.

50.    When purchasing Roundup Super Concentrate, plaintiff was seeking a product that was effective at killing all unwanted weeds and grass, and which was more affordable than the Roundup Ready-to-Use products, and understood that he was purchasing a concentrate with a substantially better dollar-per-gallon value than the Ready-to-Use alternative (*i.e.*, the value that would be had if the product supplied the maximum number of gallons). Moreover, plaintiff was seeking a product that would yield the number of gallons represented, and a product that, at the dilution resulting in that amount of gallons, would kill all unwanted weeds and grass, including being "GUARANTEED" to "KILL[] THE ROOTS."

51.    These representations, upon all of which plaintiff relied in purchasing these products, however, were false and misleading. This is because, as described in detail herein, the Roundup Concentrates *do not* yield the volume, in gallons, as promised if following the instructions for the advertised uses prominently stated on the product's back panel.

52.    By representing the *amount* of product plaintiff was supposedly buying, Monsanto implicitly also represented the product's value to plaintiff. That representation, however, was false because, based on Monsanto's prominent mixing instructions, the Roundup Super Concentrate was effectively under-filled, such that plaintiff received a different and substantially lesser value—one with a higher cost—than Monsanto represented. Accordingly, plaintiff did not realize the benefit of his bargain and his expectations were not met.

53.     In addition, plaintiff paid substantially more than the market value represented by the price he and Monsanto bargained for. Like other class members, plaintiff bargained with Monsanto on a particular market value for a certain number of gallons of Roundup made by diluting the Roundup Super Concentrate. But because Monsanto only delivered a portion of those gallons, plaintiff paid a price-per-gallon that was significantly higher than reflected in the market price to which he and Monsanto agreed, and received an amount of gallons that was significantly lower than Monsanto promised. For these reasons, the Roundup Super Concentrate plaintiff purchased was worth less than what he paid for it.

54.     Thus, through use of the misleading representation as to the amount of product provided and thereby its value, Monsanto obtained enhanced negotiating leverage allowing it to command a price plaintiff and other class members would not have paid had they been fully informed. Specifically, plaintiff and other Class members would have paid approximately 50% less for Roundup Concentrate Plus, and 40% less for Roundup Super Concentrate, had they paid the agreed-upon market price for the number of gallons actually received.

55.     The Roundup Concentrates cost more than similar products without misleading labeling, and would have cost less absent the false and misleading statements complained of herein.

56.    Absent the false and misleading labeling complained of herein, plaintiff and other Class members would only have been willing to pay less for the Roundup Super Concentrate.

57.    By use of its misleading labeling, Monsanto created increased marketplace demand for the Roundup Concentrates, and increased its market share relative to what its demand and share would have been had Monsanto labeled the Roundup Concentrate products truthfully.

58.    Plaintiff and other Class members lost money as a result of Monsanto's deceptive claims and practices in that they did not receive what they paid for when purchasing the Roundup Concentrates.

59.    Plaintiff and other Class members detrimentally altered their position and suffered damages in an amount of the under-filled portion of her Roundup Concentrates purchase.

**B.    Elisabeth Martin**

60.    Plaintiff Elisabeth Martin purchased Roundup Super Concentrate on at least three occasions, from the Wal-Mart located at 4210 East Highland Avenue, in Highland, California, or the Lowes located at 27847 Greenspot Road, in Highland, California.

61.    Ms. Martin most recently purchased the product in January or February of 2016. Ms. Martin believes she purchased the 35.2- and/or 64-ounce sizes.

- 19 -

62.     Plaintiff used the Roundup Super Concentrate with a handheld sprayer, along her sidewalk and driveway, and to kill weeds that came up through the cement and on her patio. When using the Roundup Super Concentrate, plaintiff diluted the product according to the instructions prominently displayed on the front page of the pamphlet taped to the back panel of the product's label, which states, "For best results, add 2-1/2 fl oz (5 Tbs) to 1 gallon of water." Plaintiff opened and reviewed the inside pages of the pamphlet only after purchasing the product, and even then relied upon and followed the most prominently displayed "best results" mixing instruction.

63.     In purchasing Roundup Super Concentrate, plaintiff relied on the prominent labeling claim near the top of the front of the bottle stating that the product makes "up to 23 Gallons," or "up to 42 Gallons," which she took to mean would, in fact, make 23 gallons or 42 gallons when used as directed.

64.     When purchasing Roundup Super Concentrate, plaintiff was seeking a product that was effective at killing all unwanted weeds and grass, and which was more affordable than the Roundup Ready-to-Use products, and understood that she was purchasing a concentrate with a substantially better dollar-per-gallon value than the Ready-to-Use alternative (*i.e.*, the value that would be had if the product supplied the maximum number of gallons). Moreover, plaintiff was seeking a product that would yield the number of gallons represented, and a product that, at

the dilution resulting in that amount of gallons, would kill all unwanted weeds and grass, including being "GUARANTEED" to "KILL[] THE ROOTS."

65.    These representations, upon all of which plaintiff relied in purchasing these products, however, were false and misleading, and had the capacity, tendency, and likelihood to confuse or confound plaintiff and other consumers acting reasonably. This is because, as described in detail herein, the Roundup Concentrates *do not* yield the volume, in gallons, as promised if following the instructions for the advertised uses prominently stated on the product's back panel.

66.    By representing the *amount* of product plaintiff was supposedly buying, Monsanto implicitly also represented the product's value to plaintiff. That representation, however, was false because, based on Monsanto's prominent mixing instructions, the Roundup Super Concentrate was effectively under-filled, such that plaintiff received a different and substantially lesser value—one with a higher cost—than Monsanto represented. Accordingly, plaintiff did not realize the benefit of her bargain and her expectations were not met.

67.    In addition, plaintiff paid substantially more than the market value represented by the price she and Monsanto bargained for. Like other class members, plaintiff bargained with Monsanto on a particular market value for a certain number of gallons of Roundup made by diluting the Roundup Super Concentrate. But because Monsanto only delivered a portion of those gallons, plaintiff paid a price-per-gallon that was significantly higher than reflected in the market price to which

she and Monsanto agreed, and received an amount of gallons that was significantly lower than Monsanto promised. For these reasons, the Roundup Super Concentrate plaintiff purchased was worth less than what she paid for it.

68. Thus, through use of the misleading representation as to the amount of product provided and thereby its value, Monsanto obtained enhanced negotiating leverage allowing it to command a price plaintiff and other class members would not have paid had they been fully informed. Specifically, plaintiff and other Class members would have paid approximately 50% less for Roundup Concentrate Plus, and 40% less for Roundup Super Concentrate, had they paid the agreed-upon market price for the number of gallons actually received.

69. The Roundup Concentrates cost more than similar products without misleading labeling, and would have cost less absent the false and misleading statements complained of herein.

70. Absent the false and misleading labeling complained of herein, plaintiff and other Class members would only have been willing to pay less for the Roundup Super Concentrate.

71. By use of its misleading labeling, Monsanto created increased marketplace demand for the Roundup Concentrates, and increased its market share relative to what its demand and share would have been had Monsanto labeled the Roundup Concentrate products truthfully.

72.     Plaintiff and other Class members lost money as a result of Monsanto's deceptive claims and practices in that they did not receive what they paid for when purchasing the Roundup Concentrates.

73.     Plaintiff and other Class members detrimentally altered their position and suffered damages in an amount of the under-filled portion of her Roundup Concentrates purchase.

74.     Plaintiff regularly uses herbicides to maintain her property. If plaintiff could be assured that statements regarding the amount of Roundup yielded when mixing according to the instructions for the advertised uses was accurate, and that the price of the products reflected a market value consistent with the amount of product actually provided, she would purchase the product or other similar Roundup concentrate products in the future.

## C.     Robert Ravencamp

75.     Plaintiff Robert Ravencamp purchased Roundup Concentrate Plus on at least 3 occasions over the last five years, primarily from the Lowe's at 19000 E. Valley View Parkway, Independence, MO 64055. Mr. Ravencamp purchased the 32 oz. bottle.

76.     In purchasing Roundup Concentrate Plus, plaintiff relied on the prominent labeling claim near the top of the front of the bottle stating that the product makes "up to 10 Gallons" which he took to mean would, in fact, make 10 gallons when used as directed. Mr. Ravencamp diluted the product in accordance

with Monsanto's on-product instructions on the outside of the back panel of the container.

77.    When purchasing Roundup Super Concentrate, plaintiff was seeking a product that was effective at killing all unwanted weeds and grass, and which was more affordable than the Roundup Ready-to-Use products, and understood that he was purchasing a concentrate with a substantially better dollar-per-gallon value than the Ready-to-Use alternative (*i.e.*, the value that would be had if the product supplied the maximum number of gallons). Moreover, plaintiff was seeking a product that would yield the number of gallons represented, and a product that, at the dilution resulting in that amount of gallons, would kill all unwanted weeds and grass, including being "GUARANTEED" to "KILL[] THE ROOTS."

78.    These representations, upon all of which plaintiff relied in purchasing the product, however, were false and misleading, and had the capacity, tendency, and likelihood to confuse or confound plaintiff and other consumers acting reasonably. This is because, as described in detail herein, the Roundup Concentrates *do not* yield the volume, in gallons, as promised if following the instructions for the advertised uses prominently stated on the product's back panel.

79.    By representing the *amount* of product plaintiff was supposedly buying, Monsanto implicitly also represented the product's value to plaintiff. That representation, however, was false because, based on Monsanto's prominent mixing instructions, the Roundup Super Concentrate was effectively under-filled, such that

plaintiff received a different and substantially lesser value—one with a higher cost—than Monsanto represented. Accordingly, plaintiff did not realize the benefit of his bargain and his expectations were not met.

80.     In addition, plaintiff paid substantially more than the market value represented by the price he and Monsanto bargained for. Like other class members, plaintiff bargained with Monsanto on a particular market value for a certain number of gallons of Roundup made by diluting the Roundup Super Concentrate. But because Monsanto only delivered a portion of those gallons, plaintiff paid a price-per-gallon that was significantly higher than reflected in the market price to which he and Monsanto agreed, and received an amount of gallons that was significantly lower than Monsanto promised. For these reasons, the Roundup Super Concentrate plaintiff purchased was worth less than what he paid for it.

81.     Thus, through use of the misleading representation as to the amount of product provided and thereby its value, Monsanto obtained enhanced negotiating leverage allowing it to command a price plaintiff and other class members would not have paid had they been fully informed. Specifically, plaintiff and other Class members would have paid approximately 50% less for Roundup Concentrate Plus, and 40% less for Roundup Super Concentrate, had they paid the agreed-upon market price for the number of gallons actually received.

82.    The Roundup Concentrates cost more than similar products without misleading labeling, and would have cost less absent the false and misleading statements complained of herein.

83.    Absent the false and misleading labeling complained of herein, plaintiff and other Class members would only have been willing to pay less for the Roundup Super Concentrate.

84.    By use of its misleading labeling, Monsanto created increased marketplace demand for the Roundup Concentrates, and increased its market share relative to what its demand and share would have been had Monsanto labeled the Roundup Concentrate products truthfully.

85.    Plaintiff and other Class members lost money as a result of Monsanto's deceptive claims and practices in that they did not receive what they paid for when purchasing the Roundup Concentrates.

86.    Plaintiff and other Class members detrimentally altered their position and suffered damages in an amount of the under-filled portion of his Roundup Concentrates purchase.

87.    If plaintiff could be assured that statements regarding the amount of Roundup yielded when mixing according to the instructions for the advertised uses was accurate, and that the price of the products reflected a market value consistent with the amount of product actually provided, he would purchase the product or other similar Roundup concentrate products in the future.

**D.    Amy Ward**

88.    In April 2016, Plaintiff Amy Ward purchased a bottle of the Roundup Super Concentrate. Plaintiff purchased the product at a local retailer where she had purchased the Ready-to-Use product previously.

89.    Ms. Ward was familiar with the Ready-to-Use product, as Plaintiff had used it previously in her yard and around the outside of her home.

90.    In April 2016, Plaintiff purchased the Roundup Super Concentrate as opposed to the Ready-to-Use product. Plaintiff purchased the Roundup Super Concentrate for use at her Mother's home in Minooka, Illinois.  The area that needed attention at her Mother's home was substantially larger than the area where she used the Ready-to-Use product at her own home. Plaintiff estimated that she would need approximately 40 gallons of finished product to kill weeds and grass at her Mother's home.

91.    Plaintiff purchased the 64 fl. oz. bottle of Roundup Super Concentrate because Monsanto advertised that the concentrated product would make up to 42 gallons, and the Roundup Super Concentrate cost about $110. Plaintiff estimated the product would be sufficient to kill the weeds and grass in the driveway and around her Mother's home.

92.    Plaintiff estimated that 42 gallons would yield a sufficient amount of finished product to complete the weed and grass killing project at her Mother's home.

93.     Plaintiff did not tear open the pamphlet on the back of the bottle before purchasing the product.  When Plaintiff purchased the product, she believed the pamphlet contained the same information that was displayed on the outside of the bottle.  Before purchasing the product, Plaintiff did not believe that it would be appropriate to tear open the pamphlet on the back of the bottle.

94.     Plaintiff purchased the Roundup Super Concentrate because given the size of the area she needed to treat at her Mother's home, it was expected that the Roundup Super Concentrate would be a better value than the Ready-to-Use product and because she expected the finished product would yield 42 gallons.

95.     Plaintiff mixed the product with water according to the graphic on the back of the bottle and the instructions inside the pamphlet (i.e., 2 ½ fl. oz. of concentrate per gallon of water).

96.     When purchasing Roundup Super Concentrate, Plaintiff was seeking a product that was effective at killing all unwanted weeds and grass, and which was more affordable than the Roundup Ready-to-Use products. Plaintiff understood that she was purchasing a concentrate with a substantially better dollar-per-gallon value than the Ready-to-Use alternative (i.e., the value that would be had if the product supplied the maximum number of gallons). Moreover, Plaintiff was seeking a product that would yield 42 gallons of finished product that would kill all unwanted weeds and grass, including a product that "KILLS THE ROOTS" … "GUARANTEED".

97.    Those representations, upon all of which Plaintiff relied in purchasing the product, however, were false and misleading.  That is because, as described in detail herein, the Roundup Concentrates do not yield the volume, in gallons, as promised if following the instructions for the advertised uses prominently stated on the product's back panel.

98.    By representing the amount of finished product Plaintiff was supposedly buying, Monsanto implicitly also represented the product's value to Plaintiff.  That representation, however, was false because, based on Monsanto's prominent mixing instructions, the Roundup Super Concentrate was effectively under-filled, such that Plaintiff received a different and substantially lesser value - - and, one with a higher cost - - than Monsanto represented. In effect, Plaintiff received half the product she believed she purchased.  Accordingly, Plaintiff did not realize the benefit of her bargain and her expectations were not met.

99.    In addition, Plaintiff paid substantially more than the market value represented by the price she and Monsanto bargained for.  Like other class members, Plaintiff bargained with Monsanto on a particular market value for a certain number of gallons of Roundup made by diluting the Roundup Super Concentrate. But because Monsanto only delivered a portion of those gallons, Plaintiff paid a price-per-gallon that was significantly higher than reflected in the market price to which she and Monsanto agreed, and she received a number of gallons that was significantly less than what Monsanto promised. For those reasons,

the Roundup Super Concentrate Plaintiff purchased was worth less than what she paid for it.

100.    Thus, through use of the misleading representation as to the amount of product provided and thereby its value, Monsanto obtained enhanced negotiating leverage allowing it to command a price Plaintiff and other class members would not have paid had they been fully informed.  Specifically, Plaintiff and other Class members would have paid approximately 50% less for Roundup Concentrate Plus, and 40% less for Roundup Super Concentrate, had they paid the agreed-upon market price for the number of gallons actually received.

101.    Absent the false and misleading labeling complained of herein, Plaintiff and other Class members would only have been willing to pay less for the Roundup Concentrates.

102.    Plaintiff and other Class members lost money as a result of Monsanto's deceptive claims and practices in that they did not receive what they paid for when purchasing the Roundup Concentrates.

103.    Plaintiff and other Class members detrimentally altered their position and suffered actual damages in an amount of the under-filled portion of the Roundup Concentrate purchases.

**E.    Cynthia Davies**

104.    In 2016, Plaintiff Cynthia Davies purchased a bottle of the Round*up* Super Concentrate.

105.   Ms. Davies purchased the Round*up* Super Concentrate for use at her home.

106.   Plaintiff did not tear open the pamphlet on the back of the bottle before purchasing the product.

107.   Plaintiff did not believe that it would be appropriate to tear open the pamphlet on the back of the bottle prior to purchase.

108.   When Plaintiff purchased the product, she believed the pamphlet contained the same information that was displayed on the outside of the bottle.

109.   Plaintiff purchased the Round*up* Super Concentrate because she expected the concentrate to be a better value than the Ready-to-Use product.

110.   Plaintiff mixed the product with water according to the graphic on the back of the bottle and the instructions inside the pamphlet (i.e., 2 1/2 fl. oz. of concentrate per gallon of water).

111.   When purchasing Round*up* Super Concentrate, Plaintiff was seeking a product that was effective at killing all unwanted weeds and grass, and which was more affordable than the Round*up* Ready-to-Use products.

112.   Plaintiff understood that she was purchasing a concentrate with a substantially better dollar-per-gallon value than the Ready-to-Use alternative (*i.e.*, the value that would be had if the product supplied the maximum number of gallons). Moreover, Plaintiff was seeking a product that would kill all unwanted

weeds and grass, including a product that "KILLS THE ROOTS" …
"GUARANTEED".

113.   Those representations, upon which Plaintiff relied in purchasing the
product, however, were false and misleading.  That is because, as described in detail
herein, the Round*up* Concentrates do not yield the volume, in gallons, as promised
if following the instructions for the advertised uses prominently stated on the
product's back panel.

114.   By representing the amount of finished product Plaintiff was
supposedly buying, Monsanto implicitly also represented the product's value to
Plaintiff.  That representation, however, was false because, based on Monsanto's
prominent mixing instructions, the Round*up* Super Concentrate was effectively
under-filled, such that Plaintiff received a different and substantially lesser value,
and, one with a higher cost, than Monsanto represented. In effect, Plaintiff received
half the product she believed she purchased.  Accordingly, Plaintiff did not realize
the benefit of her bargain and her expectations were not met.

115.   In addition, Plaintiff paid substantially more than the market value
represented by the price she and Monsanto bargained for.  Like other class
members, Plaintiff bargained with Monsanto on a particular market value for a
certain number of gallons of Round*up* made by diluting the Round*up* Super
Concentrate. But because Monsanto only delivered a portion of those gallons,
Plaintiff paid a price-per-gallon that was significantly higher than reflected in the

market price to which she and Monsanto agreed, and she received a number of gallons that was significantly less than what Monsanto promised. For those reasons, the Round*up* Super Concentrate Plaintiff purchased was worth less than what she paid for it.

116.   Thus, through use of the misleading representation as to the amount of product provided and thereby its value, Monsanto obtained enhanced negotiating leverage allowing it to command a price Plaintiff and other class members would not have paid had they been fully informed.  Specifically, Plaintiff and other Class members would have paid approximately 50% less for Round*up* Concentrate Plus, and 40% less for Round*up* Super Concentrate, had they paid the agreed-upon market price for the number of gallons actually received.

117.   Absent the false and misleading labeling complained of herein, Plaintiff and other Class members would only have been willing to pay less for the Round*up* Concentrates.

118.   Plaintiff and other Class members lost money as a result of Monsanto's deceptive claims and practices in that they did not receive what they paid for when purchasing the Round*up* Concentrates.

119.   Plaintiff and other Class members detrimentally altered their position and suffered actual damages in an amount of the under-filled portion of the Round*up* Concentrate purchases.

**F.     Christopher Abbott**

120.   In July 2015, Plaintiff Christopher Abbott purchased a bottle of the Roundup Concentrate Plus from a local retailer.

121.   Mr. Abbott was familiar with the Ready-to-Use product, as Plaintiff had used it previously in his parents' yard and around their home.

122.   Plaintiff purchased the Roundup Concentrate Plus for use when he moved to his new home.  The back yard of his new home was substantially larger than the area where he used the Ready-to-Use product at his parents' home. Plaintiff estimated that 10 gallons of finished product would be sufficient to kill weeds and grass in the back yard of his new home.

123.   Plaintiff purchased the 32-fl. oz. bottle of Roundup Concentrate Plus because Monsanto advertised that the concentrated product would make up to 10 gallons, and the Roundup Concentrate Plus cost about $25.

124.   Plaintiff estimated that 10 gallons would yield a sufficient amount of finished product to kill the unwanted weeds and grass at his new home.

125.   Plaintiff did not tear open the pamphlet on the back of the bottle before purchasing the product. Plaintiff did not believe that it would be appropriate to tear open the pamphlet on the back of the bottle prior to purchase. When Plaintiff purchased the product, he believed the pamphlet contained the same information that was displayed on the outside of the bottle.

126.   Plaintiff purchased the Roundup Concentrate Plus because he expected the Roundup Concentrate Plus to be a better value than the Ready-to-Use product as he expected the finished product to yield 10 gallons.

127.   Plaintiff mixed the product with water according to the graphic on the back of the bottle and the instructions inside the pamphlet (i.e., 6 fl. oz. of concentrate per gallon of water).

128.   When purchasing Roundup Concentrate Plus, Plaintiff was seeking a product that was effective at killing all unwanted weeds and grass, and which was more affordable than the Roundup Ready-to-Use products. Plaintiff understood that he was purchasing a concentrate with a substantially better dollar-per-gallon value than the Ready-to-Use alternative (i.e., the value that would be had if the product supplied the maximum number of gallons). Moreover, Plaintiff was seeking a product that would yield 10 gallons of finished product that would kill all unwanted weeds and grass, including a product that "KILLS THE ROOTS" … "GUARANTEED".

129.   Those representations, upon which Plaintiff relied in purchasing the product, however, were false and misleading.  That is because, as described in detail herein, the Roundup Concentrates do not yield the volume, in gallons, as promised if following the instructions for the advertised uses prominently stated on the product's back panel.

130.   By representing the amount of finished product Plaintiff was supposedly buying, Monsanto implicitly also represented the product's value to Plaintiff.  That representation, however, was false because, based on Monsanto's prominent mixing instructions, the Roundup Concentrate Plus was effectively under-filled, such that Plaintiff received a different and substantially lesser value, and, one with a higher cost, than Monsanto represented. In effect, Plaintiff received half the product he believed he purchased.  Accordingly, Plaintiff did not realize the benefit of his bargain and his expectations were not met.

131.   In addition, Plaintiff paid substantially more than the market value represented by the price he and Monsanto bargained for.  Like other class members, Plaintiff bargained with Monsanto on a particular market value for a certain number of gallons of Roundup made by diluting the Roundup Concentrate Plus. But because Monsanto only delivered a portion of those gallons, Plaintiff paid a price-per-gallon that was significantly higher than reflected in the market price to which he and Monsanto agreed, and he received a number of gallons that was significantly less than what Monsanto promised. For those reasons, the Roundup Concentrate Plus Plaintiff purchased was worth less than what he paid for it.

132.   Thus, through use of the misleading representation as to the amount of product provided and thereby its value, Monsanto obtained enhanced negotiating leverage allowing it to command a price Plaintiff and other class members would not have paid had they been fully informed.  Specifically, Plaintiff and other Class

members would have paid approximately 50% less for Roundup Concentrate Plus, and 40% less for Roundup Super Concentrate, had they paid the agreed-upon market price for the number of gallons actually received.

133.   Absent the false and misleading labeling complained of herein, Plaintiff and other Class members would only have been willing to pay less for the Roundup Concentrates.

134.   Plaintiff and other Class members lost money as a result of Monsanto's deceptive claims and practices in that they did not receive what they paid for when purchasing the Roundup Concentrates.

135.   Plaintiff and other Class members detrimentally altered their position and suffered actual damages in an amount of the under-filled portion of the Roundup Concentrate purchases.

## G.   Owen Olson

136.   In April 2015, Plaintiff Owen Olson purchased a bottle of the Roundup Super Concentrate. Plaintiff purchased the product at a local retailer.

137.   Mr. Olson purchased the Roundup Super Concentrate as opposed to the Ready-to-Use product.

138.   Plaintiff purchased the Roundup Super Concentrate for personal use.

139.   Plaintiff purchased the 35.2 fl. oz. bottle of Roundup Super Concentrate because Monsanto advertised that the concentrated product would

make up to 23 gallons. The Roundup Super Concentrate cost about $50. Plaintiff estimated the product would be sufficient for his personal use.

140.   Plaintiff estimated that 23 gallons would yield a sufficient amount of finished product to kill the weeds and grass.

141.   Plaintiff did not tear open the pamphlet on the back of the bottle before purchasing the product. When Plaintiff purchased the product, he believed the pamphlet contained the same information that was displayed on the outside of the bottle. Before purchasing the product, Plaintiff did not believe that it would be appropriate to tear open the pamphlet on the back of the bottle.

142.   Plaintiff purchased the Roundup Super Concentrate because given the size of the area he needed to treat, it was expected that the Roundup Super Concentrate would be a better value than the Ready-to-Use product and because he expected the finished product would yield 23 gallons.

143.   Plaintiff mixed the product with water according to the graphic on the back of the bottle and the instructions inside the pamphlet (i.e., 2 1/2 fl. oz. of concentrate per gallon of water).

144.   When purchasing Roundup Super Concentrate, Plaintiff was seeking a product that was effective at killing all unwanted weeds and grass, and which was more affordable than the Roundup Ready-to-Use products. Plaintiff understood that he was purchasing a concentrate with a substantially better dollar-per-gallon value than the Ready-to-Use alternative (i.e., the value that would be had if the product

supplied the maximum number of gallons). Moreover, Plaintiff was seeking a product that would yield 23 gallons of finished product that would kill all unwanted weeds and grass, including a product that "KILLS THE ROOTS" … "GUARANTEED".

145.   Those representations, upon all of which Plaintiff relied in purchasing the product, however, were false and misleading. That is because, as described in detail herein, the Roundup Concentrates do not yield the volume, in gallons, as promised if following the instructions for the advertised uses prominently stated on the product's back panel.

146.   By representing the amount of finished product Plaintiff was supposedly buying, Monsanto implicitly also represented the product's value to Plaintiff.

147.   That representation, however, was false because, based on Monsanto's prominent mixing instructions, the Roundup Super Concentrate was effectively under-filled, such that Plaintiff received a different and substantially lesser value - - and, one with a higher cost - - than Monsanto represented. In effect, Plaintiff received half the product he believed he purchased. Accordingly, Plaintiff did not realize the benefit of his bargain and his expectations were not met.

148.   In addition, Plaintiff paid substantially more than the market value represented by the price he and Monsanto bargained for. Like other class members, Plaintiff bargained with Monsanto on a particular market value for a certain number

of gallons of Roundup made by diluting the Roundup Super Concentrate. But because Monsanto only delivered a portion of those gallons, Plaintiff paid a price-per-gallon that was significantly higher than reflected in the market price to which he and Monsanto agreed, and he received a number of gallons that was significantly less than what Monsanto promised. For those reasons, the Roundup Super Concentrate Plaintiff purchased was worth less than what he paid for it.

149.   Thus, through use of the misleading representation as to the amount of product provided and thereby its value, Monsanto obtained enhanced negotiating leverage allowing it to command a price Plaintiff and other class members would not have paid had they been fully informed. Specifically, Plaintiff and other Class members would have paid approximately 50% less for Roundup Concentrate Plus, and 40% less for Roundup Super Concentrate, had they paid the agreed- upon market price for the number of gallons actually received.

150.   Absent the false and misleading labeling complained of herein, Plaintiff and other Class members would only have been willing to pay less for the Roundup Concentrates.

151.   Plaintiff and other Class members lost money as a result of Monsanto's deceptive claims and practices in that they did not receive what they paid for when purchasing the Roundup Concentrates.

152.   Plaintiff and other Class members detrimentally altered their position and suffered actual damages in an amount of the under-filled portion of the Roundup Concentrate purchases.

**H.    Jeannie A. Gilchrist**

153.   In May 2016, Plaintiff Jeannie A. Gilchrist purchased a bottle of the Roundup Concentrate Plus. Plaintiff purchased the product at a local retailer.

154.   Ms. Gilchrist purchased the Roundup Concentrate Plus as opposed to the Ready-to-Use product.

155.   Plaintiff purchased the Roundup Concentrate Plus for personal use.

156.   Plaintiff purchased the 32 fl. oz. bottle of Roundup Concentrate Plus because Monsanto advertised that the concentrated product would make up to 10 gallons. The Roundup Concentrate Plus cost about $20. Plaintiff estimated the product would be sufficient for his personal use.

157.   Plaintiff estimated that 10 gallons would yield a sufficient amount of finished product to kill the weeds and grass.

158.   Plaintiff did not tear open the pamphlet on the back of the bottle before purchasing the product.  When Plaintiff purchased the product, she believed the pamphlet contained the same information that was displayed on the outside of the bottle.  Before purchasing the product, Plaintiff did not believe that it would be appropriate to tear open the pamphlet on the back of the bottle.

159.   Plaintiff purchased the Roundup Concentrate Plus because given the size of the area she needed to treat, it was expected that the Roundup Concentrate Plus would be a better value than the Ready-to-Use product and because she expected the finished product would yield 10 gallons.

160.   Plaintiff mixed the product with water according to the graphic on the back of the bottle and the instructions inside the pamphlet (i.e., 6 fl. oz. of concentrate per gallon of water).

161.   When purchasing Roundup Concentrate Plus, Plaintiff was seeking a product that was effective at killing all unwanted weeds and grass, and which was more affordable than the Roundup Ready-to-Use products. Plaintiff understood that she was purchasing a concentrate with a substantially better dollar-per-gallon value than the Ready-to-Use alternative (i.e., the value that would be had if the product supplied the maximum number of gallons). Moreover, Plaintiff was seeking a product that would yield 10 gallons of finished product that would kill all unwanted weeds and grass, including a product that "KILLS THE ROOTS" … "GUARANTEED".

162.   Those representations, upon all of which Plaintiff relied in purchasing the product, however, were false and misleading.  That is because, as described in detail herein, the Roundup Concentrates do not yield the volume, in gallons, as promised if following the instructions for the advertised uses prominently stated on the product's back panel.

163.   By representing the amount of finished product Plaintiff was supposedly buying, Monsanto implicitly also represented the product's value to Plaintiff.  That representation, however, was false because, based on Monsanto's prominent mixing instructions, the Roundup Concentrate Plus was effectively under-filled, such that Plaintiff received a different and substantially lesser value - - and, one with a higher cost - - than Monsanto represented. In effect, Plaintiff received half the product she believed she purchased.  Accordingly, Plaintiff did not realize the benefit of her bargain and her expectations were not met.

164.   In addition, Plaintiff paid substantially more than the market value represented by the price she and Monsanto bargained for.  Like other class members, Plaintiff bargained with Monsanto on a particular market value for a certain number of gallons of Roundup made by diluting the Roundup Concentrate Plus. But because Monsanto only delivered a portion of those gallons, Plaintiff paid a price-per-gallon that was significantly higher than reflected in the market price to which she and Monsanto agreed, and she received a number of gallons that was significantly less than what Monsanto promised. For those reasons, the Roundup Concentrate Plus Plaintiff purchased was worth less than what she paid for it.

165.   Thus, through use of the misleading representation as to the amount of product provided and thereby its value, Monsanto obtained enhanced negotiating leverage allowing it to command a price Plaintiff and other class members would not have paid had they been fully informed.  Specifically, Plaintiff and other Class

members would have paid approximately 50% less for Roundup Concentrate Plus, and 40% less for Roundup Super Concentrate, had they paid the agreed-upon market price for the number of gallons actually received.

166.  Absent the false and misleading labeling complained of herein, Plaintiff and other Class members would only have been willing to pay less for the Roundup Concentrates.

167.  Plaintiff and other Class members lost money as a result of Monsanto's deceptive claims and practices in that they did not receive what they paid for when purchasing the Roundup Concentrates.

168.  Plaintiff and other Class members detrimentally altered their position and suffered actual damages in an amount of the under-filled portion of the Roundup Concentrate purchases.

## I.     Zachary Sholar

169.  In April 2016, Plaintiff purchased a bottle of the Roundup Super Concentrate. Plaintiff purchased the product at a local retailer where he had purchased the Ready-to-Use product previously.

170.  Plaintiff was familiar with the Ready-to-Use product, as Plaintiff had used it previously in his yard and around the outside of his home.

171.  In April 2016, Plaintiff purchased the Roundup Super Concentrate as opposed to the Ready-to-Use product. Plaintiff purchased the Roundup Super Concentrate for use at his home in Pekin, Indiana.  Plaintiff estimated that he would

need approximately 42 gallons of finished product to kill weeds and grass at his home.

172.   Plaintiff purchased the 64 fl. oz. bottle of Roundup Super Concentrate because Monsanto advertised that the concentrated product would make up to 42 gallons, and the Roundup Super Concentrate cost about $75. Plaintiff estimated the product would be sufficient to kill the weeds and grass at his home.

173.   Plaintiff estimated that 42 gallons would yield a sufficient amount of finished product to complete the weed and grass killing project at his home.

174.   Plaintiff did not tear open the pamphlet on the back of the bottle before purchasing the product.  When Plaintiff purchased the product, he believed the pamphlet contained the same information that was displayed on the outside of the bottle.  Before purchasing the product, Plaintiff did not believe that it would be appropriate to tear open the pamphlet on the back of the bottle.

175.   Plaintiff purchased the Roundup Super Concentrate because given the size of the area he needed to treat, it was expected that the Roundup Super Concentrate would be a better value than the Ready-to-Use product and because he expected the finished product would yield 42 gallons.

176.   Plaintiff mixed the product with water according to the graphic on the back of the bottle and the instructions inside the pamphlet (i.e., 2 ½ fl. oz. of concentrate per gallon of water).

177.   When purchasing Roundup Super Concentrate, Plaintiff was seeking a product that was effective at killing all unwanted weeds and grass, and which was more affordable than the Roundup Ready-to-Use products. Plaintiff understood that he was purchasing a concentrate with a substantially better dollar-per-gallon value than the Ready-to-Use alternative (i.e., the value that would be had if the product supplied the maximum number of gallons). Moreover, Plaintiff was seeking a product that would yield 42 gallons of finished product that would kill all unwanted weeds and grass, including a product that "KILLS THE ROOTS" … "GUARANTEED".

178.   Those representations, upon all of which Plaintiff relied in purchasing the product, however, were false and misleading.  That is because, as described in detail herein, the Roundup Concentrates do not yield the volume, in gallons, as promised if following the instructions for the advertised uses prominently stated on the product's back panel.

179.   By representing the amount of finished product Plaintiff was supposedly buying, Monsanto implicitly also represented the product's value to Plaintiff.  That representation, however, was false because, based on Monsanto's prominent mixing instructions, the Roundup Super Concentrate was effectively under-filled, such that Plaintiff received a different and substantially lesser value - - and, one with a higher cost - - than Monsanto represented. In effect, Plaintiff

received half the product he believed he purchased.  Accordingly, Plaintiff did not realize the benefit of his bargain and his expectations were not met.

180.   In addition, Plaintiff paid substantially more than the market value represented by the price he and Monsanto bargained for.  Like other class members, Plaintiff bargained with Monsanto on a particular market value for a certain number of gallons of Roundup made by diluting the Roundup Super Concentrate. But because Monsanto only delivered a portion of those gallons, Plaintiff paid a price-per-gallon that was significantly higher than reflected in the market price to which he and Monsanto agreed, and he received a number of gallons that was significantly less than what Monsanto promised. For those reasons, the Roundup Super Concentrate Plaintiff purchased was worth less than what he paid for it.

181.   Thus, through use of the misleading representation as to the amount of product provided and thereby its value, Monsanto obtained enhanced negotiating leverage allowing it to command a price Plaintiff and other class members would not have paid had they been fully informed.  Specifically, Plaintiff and other Class members would have paid approximately 50% less for Roundup Concentrate Plus, and 40% less for Roundup Super Concentrate, had they paid the agreed-upon market price for the number of gallons actually received.

182.   Absent the false and misleading labeling complained of herein, Plaintiff and other Class members would only have been willing to pay less for the Roundup Concentrates.

183.   Plaintiff and other Class members lost money as a result of Monsanto's deceptive claims and practices in that they did not receive what they paid for when purchasing the Roundup Concentrates.

184.   Plaintiff and other Class members detrimentally altered their position and suffered actual damages in an amount of the under-filled portion of the Roundup Concentrate purchases.

**J.     Matthew Myers**

185.   In March 2016, Plaintiff Matthew Myers purchased a bottle of the Roundup Super Concentrate.

186.   In March 2016, Plaintiff purchased the Roundup Super Concentrate as opposed to the Ready-to-Use product.

187.   Plaintiff purchased the Roundup Super Concentrate for use at his home.

188.   Plaintiff purchased the 64 fl. oz. bottle of Roundup Super Concentrate because Monsanto advertised that the concentrated product would make up to 42 gallons, and the Roundup Super Concentrate cost about $75.

189.   Plaintiff estimated that 42 gallons would yield a sufficient amount of finished product to kill the weeds and grass at his home.

190.   Plaintiff did not tear open the pamphlet on the back of the bottle before purchasing the product.  When Plaintiff purchased the product, he believed the pamphlet contained the same information that was displayed on the outside of the

bottle.  Before purchasing the product, Plaintiff did not believe that it would be appropriate to tear open the pamphlet on the back of the bottle.

191.   Plaintiff purchased the Roundup Super Concentrate because given the size of the area he needed to treat, it was expected that the Roundup Super Concentrate would be a better value than the Ready-to-Use product and because he expected the finished product would yield 42 gallons.

192.   Plaintiff mixed the product with water according to the graphic on the back of the bottle and the instructions inside the pamphlet (i.e., 2 ½ fl. oz. of concentrate per gallon of water).

193.   When purchasing Roundup Super Concentrate, Plaintiff was seeking a product that was effective at killing all unwanted weeds and grass, and which was more affordable than the Roundup Ready-to-Use products. Plaintiff understood that he was purchasing a concentrate with a substantially better dollar-per-gallon value than the Ready-to-Use alternative (i.e., the value that would be had if the product supplied the maximum number of gallons). Moreover, Plaintiff was seeking a product that would yield 42 gallons of finished product that would kill all unwanted weeds and grass, including a product that "KILLS THE ROOTS" … "GUARANTEED".

194.   Those representations, upon all of which Plaintiff relied in purchasing the product, however, were false and misleading.  That is because, as described in detail herein, the Roundup Concentrates do not yield the volume, in gallons, as

promised if following the instructions for the advertised uses prominently stated on the product's back panel.

195.   By representing the amount of finished product Plaintiff was supposedly buying, Monsanto implicitly also represented the product's value to Plaintiff.  That representation, however, was false because, based on Monsanto's prominent mixing instructions, the Roundup Super Concentrate was effectively under-filled, such that Plaintiff received a different and substantially lesser value - - and, one with a higher cost - - than Monsanto represented. In effect, Plaintiff received half the product she believed she purchased.  Accordingly, Plaintiff did not realize the benefit of his bargain and her expectations were not met.

196.   In addition, Plaintiff paid substantially more than the market value represented by the price he and Monsanto bargained for.  Like other class members, Plaintiff bargained with Monsanto on a particular market value for a certain number of gallons of Roundup made by diluting the Roundup Super Concentrate. But because Monsanto only delivered a portion of those gallons, Plaintiff paid a price-per-gallon that was significantly higher than reflected in the market price to which he and Monsanto agreed, and he received a number of gallons that was significantly less than what Monsanto promised. For those reasons, the Roundup Super Concentrate Plaintiff purchased was worth less than what he paid for it.

197.   Thus, through use of the misleading representation as to the amount of product provided and thereby its value, Monsanto obtained enhanced negotiating

leverage allowing it to command a price Plaintiff and other class members would not have paid had they been fully informed.  Specifically, Plaintiff and other Class members would have paid approximately 50% less for Roundup Concentrate Plus, and 40% less for Roundup Super Concentrate, had they paid the agreed-upon market price for the number of gallons actually received.

198.   Absent the false and misleading labeling complained of herein, Plaintiff and other Class members would only have been willing to pay less for the Roundup Concentrates.

199.   Plaintiff and other Class members lost money as a result of Monsanto's deceptive claims and practices in that they did not receive what they paid for when purchasing the Roundup Concentrates.

200.   Plaintiff and other Class members detrimentally altered their position and suffered actual damages in an amount of the under-filled portion of the Roundup Concentrate purchases.

K.    Michael Overstreet

201.   In  March  2016,  Plaintiff Michael Overstreet purchased a bottle of the Roundup Concentrate Plus. Plaintiff purchased the product at a local retailer.

202.   Plaintiff purchased the Roundup Concentrate Plus as opposed to the Ready-to-Use product.

203.   Plaintiff purchased the Roundup Concentrate Plus for use at his home.

204.   Plaintiff purchased the 36.8 fl. oz. bottle of Roundup Concentrate Plus because Monsanto advertised that the concentrated  product would make up to 12 gallons. The Roundup Concentrate Plus cost about $30. Plaintiff  estimated the product would be sufficient to kill the weeds and grass at his home.

205.   Plaintiff estimated that 12 gallons would yield a sufficient amount of finished product to kill the weeds and grass at his home.

206.   Plaintiff did not tear open the pamphlet on the back of the bottle before purchasing the product. When Plaintiff purchased the product, he believed the pamphlet contained the same information that was displayed on the outside of the bottle.  Before  purchasing  the product, Plaintiff did not believe that it would be appropriate to tear open the pamphlet on the back of the bottle.

207.   Plaintiff purchased the Roundup Concentrate Plus because given the size of the area he needed to treat, it was expected that the Roundup Concentrate Plus would  be  a  better  value  than  the  Ready-to-Use  product  and  because  he expected the finished product would yield 12 gallons.

208.   Plaintiff mixed the product with water  according to the graphic on the back  of  the  bottle  and  the  instructions  inside  the  pamphlet  (i.e.,  6  fl.  oz.  of concentrate per gallon of water).

209.   When purchasing Roundup Concentrate Plus, Plaintiff was seeking a product that was effective at killing all unwanted weeds and grass, and which was more affordable than the Roundup Ready-to-Use products. Plaintiff understood that

he was purchasing a concentrate with a substantially better dollar-per-gallon value than the Ready-to-Use alternative (i.e., the value that would be had if the product supplied the maximum number of gallons). Moreover, Plaintiff was seeking a product that would yield 12 gallons of finished product that would kill all unwanted weeds and grass, including a product that "KILLS THE ROOTS" ... "GUARANTEED".

210.   Those representations, upon all of which Plaintiff relied in purchasing the product, however, were false and misleading. That is because, as described in detail herein, the Roundup Concentrates do not yield the volume, in gallons, as promised if following the instructions for the advertised uses prominently stated on the product's back panel.

211.   By representing the amount of finished product Plaintiff was supposedly buying, Monsanto implicitly also represented the product's value to Plaintiff. That representation, however, was false because, based on Monsanto's prominent mixing instructions, the Roundup Concentrate Plus was effectively under-filled, such that Plaintiff received a different and substantially lesser value - - and, one with a higher cost - - than Monsanto represented. In effect, Plaintiff received half the product he believed he purchased. Accordingly, Plaintiff did not realize the benefit of his bargain and his expectations were not met.

212.   In addition, Plaintiff paid substantially more than the market value represented by the price he and Monsanto bargained for. Like other class members,

Plaintiff bargained with Monsanto on a particular market value for a certain number of gallons of Roundup made by diluting the Roundup Concentrate Plus. But because Monsanto only delivered a portion of those gallons, Plaintiff paid a price-per-gallon that was significantly higher than reflected in the market price to which he and Monsanto agreed, and he received a number of gallons that was significantly less than what Monsanto promised. For those reasons, the Roundup Concentrate Plus Plaintiff purchased was worth less than  what he paid for it.

213.   Thus, through use of the misleading representation as to the amount of product provided and thereby its value, Monsanto obtained enhanced negotiating leverage allowing it to command a price Plaintiff and other class members would not have paid had they been fully informed.  Specifically,  Plaintiff and other Class members would have paid approximately 50% less for Roundup Concentrate Plus, and 40% less for Roundup Super Concentrate,  had they paid the agreed-upon market price for the number of gallons actually received.

214.   Absent the false and misleading labeling complained of herein, Plaintiff and other Class members would only have  been  willing to pay less for the Roundup Concentrates.

215.   Plaintiff and other Class members lost money as a result of Monsanto's deceptive claims and practices in that they did not receive what they paid for when purchasing the Roundup Concentrates.

216.   Plaintiff and other Class members detrimentally altered their position and suffered actual damages in an amount of the under-filled portion of the Roundup Concentrate purchases.

## CLASS ACTION ALLEGATIONS

217.   While reserving the right to redefine or amend the class definition prior to seeking class certification, pursuant to Federal Rule of Civil Procedure 23, plaintiffs seek to represent a Class of all persons who, on or after April 5, 2012 (the "Class Period"), purchased in the United States, for personal or household use and not for resale or distribution, Roundup Weed & Grass Killer Concentrate Plus, or Roundup Weed & Grass Killer Super Concentrate, in packaging whose label stated that the product "makes up to" a specified number of gallons, specifically as follows:

| Product | Label Statement |
|---|---|
| Roundup Concentrate Plus 32 oz. (1 qt.) | "Makes Up to 10 Gallons" |
| Roundup Concentrate Plus 36.8 oz. | "Makes Up to 12 Gallons" |
| Roundup Concentrate Plus 40 oz. | "Makes Up to 13 Gallons" |
| Roundup Concentrate Plus 64 oz. | "Makes Up to 21 Gallons" |
| Roundup Super Concentrate 35.2 oz. | "Makes Up to 23 Gallons" |
| Roundup Super Concentrate 53.7 oz. (0.42 gal.) | "Makes Up to 35 Gallons" |
| Roundup Super Concentrate 64 oz. (1/2 gal.) | "Makes Up to 42 Gallons" |

218.   The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class members in a single action will provide substantial benefits to the parties and Court.

219.   Questions of law and fact common to plaintiffs and the Class include:

a.    Whether by mixing according to the instructions on the back label of the Roundup Concentrates, the products would result in the "Makes Up To" amount of gallons stated on the principal display panel and in the first bullet point under the heading "MIXING INSTURCTIONS" in the taped, sealed pamphlet;

b.    Whether the claimed "Makes up to" amount of gallons was material to purchasers;

c.    Whether a reasonable consumer believes that "Makes up to" actually means the product will make that amount when used under normal, reasonable conditions;

d.    Whether a reasonable consumer would remove the sealed pamphlet before purchasing any Roundup Concentrate products;

e.    Whether a reasonable consumer would notice the statement in the pamphlet and understand what "easy to kill weeds such as seedlings" means;

f.    Whether a reasonable consumer would be likely to deviate from the instructions included on the back panel of Roundup Concentrate Plus and/or in the pamphlet to "Add 6 fl oz per Gallon of Water" in light of Monsanto's representation "for best results, add 6 fl oz (12 Tbs) per gallon of water."

g.      Whether a reasonable consumer would be likely to deviate from the instructions included on the back panel of Roundup Super Concentrate and/or in the pamphlet to "Add 2 1/2 fl oz per Gallon of Water" in light of Monsanto's representation "for best results, add 2-1/2 fl oz (5 Tbs) to 1 gallon of water."

h.      Whether Monsanto's conduct violates public policy;

i.      The proper amount of damages, including punitive damages;

j.      The proper amount of restitution;

k.      The proper scope of injunctive relief, including corrective advertising and recall from the marketplace; and

l.      The proper amount of attorneys' fees.

220.   These common questions of law and fact predominate over questions that affect only individual Class members.

221.   Plaintiffs' claims are typical of Class members' claims because they are based on the same underlying facts, events, and circumstances relating to Monsanto's conduct. Specifically, all Class members, including plaintiffs, were subjected to the same misleading and deceptive conduct when they purchased the Roundup Concentrates, and suffered economic injury because Roundup Concentrates are misrepresented in the same manner. Absent Monsanto's business practice of deceptively and unlawfully labeling the Roundup Concentrates, plaintiffs and other Class members would have paid less for the products.

222.   Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action litigation, and specifically in litigation involving false and misleading advertising, and who have been appointed Class Counsel in a related action on behalf of a Class of California purchasers of the Roundup Concentrates. *Martin v. Monsanto Co.*, 2017 WL 1115167 (C.D. Cal. Mar. 24, 2017).

223.   Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class member is small, such that, absent representative litigation, it would be infeasible for Class members to redress the wrongs done to them.

224.   Monsanto has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

225.   As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3). In addition, it may be appropriate, pursuant to Fed. R. Civ. P. 23(c)(4), to maintain this action as a class action with respect to particular issues.

## CAUSES OF ACTION

## COUNT I – VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT, MO. REV. STAT. §§ 407.010 *ET SEQ.*

226.   Plaintiffs reallege and incorporates the allegations stated above in the Complaint as if set forth in full herein.

227.   Plaintiffs, other members of the Class, and defendant, are all persons within the meaning of the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010(5).

228.   Defendant conducted trade and commerce within the meaning of the MMPA, *id.* § 407.010(7).

229.   The MMPA, *id.* § 407.020.1, provides that:

The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice. . . . Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

230.   For the reasons described herein, during the Class Period, Monsanto engaged in deception, fraud, false pretense, false promise, misrepresentation, unfair

practice, concealment, suppression, and omission, in connection with its sale and advertisement of the Roundup Concentrates.

231.   Specifically, Monsanto overstated the number of gallons of spray solution the Roundup Concentrates would make, based on an unrealistic mixing instruction buried in a pamphlet that reasonable consumers would not see before purchasing the products.

232.   By virtue of Monsanto's violation, plaintiffs and other Class members suffered an ascertainable loss within the meaning of the MMPA, *id.* § 407.025.1, because the actual value of the Roundup Concentrates they purchased was less than the value of the product as represented and thus are entitled to bring this action against defendant, including on a classwide basis, *id.* §§ 407.025.2-3.

## COUNT II - VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT,  15 U.S.C. §§ 2301 *ET SEQ.*

233.   Plaintiffs reallege and incorporates the allegations elsewhere in the Complaint as if fully set forth herein.

234.   The Roundup Concentrates are consumer products within the meaning of 15 U.S.C. § 2301(1).

235.   Plaintiffs and the Class members are consumers within the meaning of 15 U.S.C. § 2301(3).

236.   Monsanto is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) & (5).

237.   The Magnuson-Moss Warranty Act permits a consumer to recover damages caused "by the failure of a supplier, warrantor, or service contractor to comply with any obligation under his [Act], or under a written warranty, implied warranty, or service contract." 15 U.S.C. § 2310(d)(1).

238.   Monsanto's claims that the Roundup Concentrates "Make[] Up to" a certain number of gallons is a "written warranty" within the meaning of the Act because it is an "affirmation of fact or written promise made in connection with the sale of" the product, "which relates to the nature of the material . . . and affirms or promises that such material . . . is defect free or will meet a specified level of performance . . . ." 15 U.S.C. § 2301(6)(A).

239.   As set forth herein, the Roundup Concentrates do not "Make[] Up to" the number of gallons claimed, unless so diluted as to make the product either ineffective, or substantially less effective than a reasonable consumer would expect based on other claims on the label, such as the statements about the applications for which the products can be used.

240.   Although the Roundup Concentrates do not meet the "Make[s] Up to" specification, Monsanto has so far failed to refund Roundup Concentrate purchasers their money.

241.   By reason of Monsanto's breach of these express warranties, Monsanto has violated the statutory rights due plaintiffs and the class members

pursuant to the Magnuson-Moss Warranty Act, thereby damaging plaintiffs and the class members. 15 U.S.C. §§ 2301 *et seq.*

242.   Plaintiffs and the class were injured as a direct and proximate result of Monsanto's breach because: (a) they would not have purchased the Roundup Concentrates on the same terms if they had known the true facts concerning the amount the products make; (b) they paid a price premium due to Monsanto's misleading representations, and (c) the Roundup Concentrates do not perform as promised when diluted to make the maximum number of gallons claimed.

243.   Plaintiffs, on behalf of themselves and the class members, seek damages, equitable relief, and attorney's fees and costs pursuant to 15 U.S.C. §§ 2310(d)(1)-(2).

## PRAYER FOR RELIEF

244.   Wherefore, plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Monsanto as to each and every cause of action, and the following remedies:

245.   An Order declaring this action to be a proper class action, appointing plaintiffs as class representative, appointing their undersigned counsel as class counsel;

246.   An Order requiring Monsanto to bear the cost of class notice;

247.   An Order compelling Monsanto to conduct a corrective advertising campaign;

248. An Order requiring Monsanto to pay all actual, compensatory, and punitive damages permitted under the causes of action alleged herein;

249. Pre- and post-judgment interest;

250. An award of attorneys' fees and costs; and

251. Any other and further relief that Court deems necessary, just, or proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully Submitted,

By: _____*/s/ Kevin Dolley*___

Jack Fitzgerald*
Thomas A. Canova*
THE LAW OFFICE OF JACK FITZGERALD, PC
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 362-9555
*jack@jackfitzgeraldlaw.com*
*tom@jackfitzgeraldlaw.com*

Sidney W. Jackson, III*
JACKSON & FOSTER, LC
75 St. Michael Street
Mobile, Alabama 36602
Phone: (251) 433-6699
Fax: (251) 433-6127
sid@jacksonfosterlaw.com

*\* Admitted Pro Hac Vice*

Kevin J. Dolley (# 54132MO)
LAW OFFICES OF KEVIN J. DOLLEY, LLC
2726 S. Brentwood Blvd.
St. Louis, Missouri 63144
Phone: (314) 645-4100
Fax: (314) 736-6216
kevin@dolleylaw.com
(Local Counsel for Plaintiffs)

*Attorneys for Plaintiffs*