**UNITED STATES DISTRICT COURT,
EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| JOSHUA RAWA, ELISABETH MARTIN, ROBERT RAVENCAMP, AMY WARD, CYNTHIA DAVIES, CHRISTOPHER ABBOTT, OWEN OLSON, JEANNIE A. GILCHRIST, ZACHARY SHOLAR, MATTHEW MYERS, JOHN W. BEARD, JR., and MICHAEL OVERSTREET on behalf of themselves, all others similarly situated, and the general public,<br><br>        Plaintiffs,<br><br>        v.<br><br>MONSANTO COMPANY,<br><br>        Defendant. | Case No.: 4:17-cv-01252-AGF |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL
OF NATIONWIDE CLASS ACTION SETTLEMENT *BY CONSENT***

With Monsanto's consent, plaintiffs respectfully move for final approval of the proposed nationwide Settlement Agreement.

**INTRODUCTION**

Monsanto manufactures and sells Roundup brand herbicide, including in concentrated form. This action alleges Monsanto misleadingly overstated the number of gallons of spray solution its Roundup Concentrate Plus and Super Concentrate products made.

On December 6, 2017, the Court granted preliminary approval to a proposed nationwide class settlement comprised of a $21.5 million non-reversionary common fund, and directed that notice be made. Dkt. No. 41, Order Granting Preliminary Approval ("PA Order"). Notice has now been carried out, and the claims period has ended. Participation in the settlement has been excellent, with tens of thousands of class members making claims in this, one of the largest consumer fraud class action settlements in U.S. history regarding retail products. The Class Representatives now respectfully request the Court's final approval.

- 1 -

# FACTS[1]

**I.     NOTICE**

  **A.     Print Notice**

Following the Court's preliminary approval, the Claims Administrator, Dahl, placed for nationwide publication in the December 21, 2017 issue of the *USA Today* newspaper, the summary notice that the Court approved. Fellows Decl. ¶ 7 & Ex. A. The same notice was published in the February 2018 issue of *Better Homes & Gardens*. *Id.*

  **B.     Digital Notice**

Between December 20, 2017 and February 14, 2018 (the "campaign period"), web-based banner notice advertisements suitable for display on both mobile and desktop webpages appeared on groups of websites from a selection of custom channels designed to reach a target audience that includes Class Members. These notices were displayed 51,226,282 times during the campaign period. *Id.* ¶¶ 8-10. Dahl also formatted keyword search notice advertisements for Google and Bing, which contained links to the Settlement Website, www.RoundupContentrateSettlement.com, and were configured to appear in response to relevant search engine queries during the campaign period. These keyword search notices were displayed 6,176 times. *Id.* ¶¶ 11-12. Dahl also posted notice advertisements on Facebook every day during the campaign period. These were displayed 24,058,081 times on the Facebook page of users with the targeted interest areas. *Id.* ¶¶ 13-14. The notice program also included audio and banner ads displayed to viewers of contextually-relevant YouTube videos, and to listeners of the Pandora Internet Radio service. *Id.* ¶ 15. YouTube ads were 10-15 seconds long and included rotating

---

[1] The procedural history, a detailed account of the settlement negotiations, and a recitation of the terms of the settlement are set forth in the Class Representatives' Memorandum in support of their Motion for Preliminary Approval. *See* Dkt. No. 32 at 2-9.

explanatory language and voice-over text. These ads were displayed 4,390,541 times to viewers during the campaign period. *Id.* ¶ 16. Pandora ads included the same rotating explanatory language and voiceover text. Listeners who were using the Pandora application in a web browser were able to both hear the voiceover and view the rotating banner language. Other listeners were able to hear the voiceover messaging. There were 5,721,852 notice impressions presented to Pandora listeners during the campaign period. *Id.* ¶ 17.

Accordingly, among the web-based (51,226,282), keyword search (6,176), social media (24,058,081), YouTube (4,390,541), and Pandora (5,721,852) notice, the digital publication campaign delivered 85,402,932 impressions. Each impression was an opportunity for a potential Class Member to listen to the voiceover messaging, read the summary notice, click on the search or social media notice advertisement, or view the Settlement Website. *See id.* ¶ 18 & Ex. B.

C. **Direct Notice**

Beginning on January 5, 2018, Dahl mailed 65,782 and emailed 57,498 initial notices to potential Class Members. On January 22, Dahl mailed 14,147 more notices, where email notices were returned as undeliverable. Recipients were directed to the Settlement Website and provided a toll-free number for detailed information on the settlement. Ness Decl. ¶ 7. Dahl sent an additional 132 notices and claim forms at the request of potential Class Members. *Id.*

D. **The Settlement Website & Information Line**

On December 20, 2017, Dahl activated the Settlement Website, which is still operating. Dahl developed the content for the website based on the Long Form Notice and Claim Form that the Court approved. The Settlement Website's address was included on the Postcard Notice, E-mail Notice, and Long Form Notice, and was the hyperlinked destination website address for all forms of digital notice. *Id.* ¶ 8 & Ex. A. The website provides Class Members with general settlement information; a list of important dates and deadlines; a list of Frequently Asked

Questions and Responses; an online Claim Form and a downloadable Claim Form; downloadable versions of settlement documents, including the Settlement Agreement, Motion for Preliminary Approval and supporting papers; the Court's PA Order; an Opt-Out Form; and information on how to contact the Claim Administrator and Class Counsel. As of March 11, 2018, the Settlement Website had received 182,574 visits. *Id.* ¶¶ 9-10.

On December 20, 2017, Dahl also established an automated toll-free information line to assist potential Class Members seeking information about the settlement. The toll-free number was printed in the Postcard Notice, E-mail Notice, Long Form Notice and Claim Form, and is displayed on the settlement website. The helpline is fully automated and operates 24 hours per day, 7 days per week, and is still operating currently. *Id.* ¶ 11. It includes a voice response system that allows callers to listen to general information about the settlement and to responses to frequently asked questions, including directions on how to obtain a Long Form Notice and Claim Form. As of March 11, 2018, the information line had received 561 calls. *Id.* ¶ 12.

### E. Other Communications

As of March 12, 2018, Dahl had received and, when appropriate, responded to 4,649 emails and 55 pieces of written correspondence related to the settlement. *Id.* ¶ 13.

### F. Class Notice and Administration Costs

To date, the cost of notice and administration is $612,017.70, and the total cost is estimated not to exceed $1.3 million by the time the settlement is fully administered. *Id.* ¶ 21. *See also* Dkt. No. 32 at 7 (notice and administration expenses estimated between $700,000 and $1.3 million).

\*      \*      \*

As a result of the foregoing, Dahl opines that the notice program reached an estimated 85-90% of the targeted audience of persons that match the characteristics of the purchasers of the

Roundup Concentrate products, at an estimated frequency of 3 times to 5 times per person; that this was the best notice practicable; and that it was compliant with Rule 23, and the guidelines established by the Federal Judicial Center's Manual for Complex Litigation, 4th Edition (2004), as well as the Federal Judicial Center's Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (2010). Fellows Decl. ¶¶ 19-20.[2]

## II.   THE CLASS'S REACTION

The Class's reaction has been substantial. The deadline for potential Class Members to file claims or opt out was March 6, 2018. As of March 11, 2018, Dahl has received 93,702 claims, valued at $27,416,595.[3] Ness Decl. ¶ 14.

Given the size of this settlement, that it involves a product with a household name (Roundup) and the value of the potential payments Class Members can claim under the settlement (particularly on larger packages), the parties and Dahl recognized a potential for fraudulent claims. Ness Decl. ¶ 15; Fitzgerald Decl. ¶ 2.[4] In order to protect the Class against such fraud, Dahl did and is doing several things to identify fraudulent or otherwise invalid claims that should

---

[2] The requirement of 28 U.S.C. § 1715, *i.e.*, CAFA notice to the state Attorneys General, was satisfied by Monsanto. *See* Fitzgerald Decl. ¶ 30.

[3] Dahl has also received 10 valid claims for exclusion. Ness Decl. ¶ 20. The quantity of claims and exclusions received is subject to change as additional timely-postmarked claims or exclusions are received, though any such change is likely to be *de minimis*. *See id.* ¶¶ 14, 21.

[4] Due diligence in evaluating claims for fraud has been especially important here given an inordinate number of claims regarding the largest package, with the largest potential dollar payout, for which there were 363,894 claims totaling $19,286,382. *See* Ness Decl. ¶ 14, Table. Although this package comprised only approximately 16% of the sales at issue during the relevant period, it accounts for over 70% of the value of the claims made. Given the amount of product that could be made from a concentrated bottle of this size, of course, there is a reasonable limit on the number of bottles that the average consumer could reasonably be expected to purchase during the applicable statute of limitations. Fitzgerald Decl. ¶ 2.

be rejected,[5] including rejecting claims: (i) over the per household product limit (such as one claim for 182 bottles, and another for 146 bottles); (ii) outside the applicable statute of limitations; (iii) for products that were not available for sale in a particular claimed state or retail location, and (iv) where multiple claims came from the same physical or IP address (in one case, 133 claims amounting to $140,299). *See* Ness Decl. ¶ 15.

As of March 11, 2018, based on these efforts, Dahl has so far validated approximately $5.3 million worth of claims,[6] and identified 16,382 claims as invalid, valued at $8,650,549. *Id.* ¶ 16. As for the remaining claims, Dahl has applied and is continuing to apply additional methods for detecting fraud, including validation based on information provided by the parties, such as regarding reasonable limits of use. *Id.* ¶ 17; *see also* Fitzgerald Decl. ¶ 4. Dahl anticipates that when claims processing is finished, there will be sufficient funds in the Common Fund to pay all approved claims, and that a *pro rata* reduction will not be necessary. Ness Decl. ¶ 18. Dahl will submit, as quickly as reasonably possible, a supplemental declaration to provide updated numbers. *Id.* ¶ 19.

## THE COURT SHOULD GRANT THE SETTLEMENT FINAL APPROVAL

"There is a long-standing policy favoring settlements of civil actions in federal courts." *In re Charter Commc'ns, Inc., Sec. Litig.*, 2005 WL 4045741, at *4 (E.D. Mo. June 30, 2005) ["*Charter Commc'ns*"] (citing *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *Holden v. Burlington Northern, Inc.*, 665 F. Supp. 1398, 1405 (D. Minn. 1987)). "In the class action context

---

[5] In accordance with standard claim administration practices, Dahl has ultimate discretion to accept or decline a claim. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 667 (7th Cir. 2015) (Courts "can rely, as they have for decades, on claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court to take into account the size of the claims, the cost of the techniques, and an empirical assessment of the likelihood of fraud or inaccuracy.").

[6] At a 50% refund, this implies valid claims of $10.6 million worth, out of the $164 million at issue for the Class, or a claims rate of 6.5%. Fitzgerald Decl. ¶ 3.

in particular, 'there is an overriding public interest in favor of settlement,'" because "[s]ettlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources." *Id.* (quotation and citations omitted). This policy is so strong, that "such agreements are "presumptively valid." *See Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist.*, 921 F.2d 1371, 1391 (8th Cir.1990); *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015).

"Federal Rule of Civil Procedure 23(e) requires judicial approval of class action settlements." *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 699 (E.D. Mo. 2002) ["*BankAmerica Corp.*"] (citing Fed. R. Civ. P. 23(e)). "In assessing whether the proposed settlement protects the interests of absent class members, the Court must determine whether the proposed settlement is fair, adequate and reasonable." *Id.* (citing *Van Horn v. Trickey*, 840 F.2d 604, 606 (8th Cir. 1988); *In re Flight Trans. Corp. Sec. Litig.*, 730 F.2d 1128, 1135 (8th Cir. 1984)); *see also Charter Commc'ns*, 2005 WL 4045741, at *4 ("Rule 23(e) requires the court to intrude on that private consensual agreement merely to ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned." (quoting *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 934 (8th Cir. 2005) ["*Wireless Fees Litig.*"])). "To make the determination, the district court must consider four factors: '(1) the merits of the plaintiff's case weighed against the terms of the settlement, (2) the defendant's financial condition, (3) the complexity and expense of further litigation, and (4) the amount of opposition to the settlement.'" *Marshall*, 787 F.3d at 508 (quotation omitted); *see also Orden v. Schafer*, 2016 WL 6893814, at *3-4 (E.D. Mo. Nov. 23, 2016) (Fleissig, J.) (quoting *Marshall*, 787 F.3d at 508). "The first factor is the 'single most important factor.'" *Huyer v. Njema*, 847 F.3d 934, 939 (8th Cir. 2017) (quoting *Van Horn*, 840 F.2d at 607).

"The district court need not make a detailed investigation consonant with trying the case;

it must, however, provide the appellate court with a basis for determining that its decision rests on 'well-reasoned conclusions' and is not 'mere boilerplate.'" *Wireless Fees Litig.*, 396 F.3d at 932-33 (quoting *Van Horn*, 840 F.2d at 607). "In evaluating the settlement, the Court[ ] 'should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation,'" *BankAmerica Corp.*, 210 F.R.D. at 700 (quoting Fed. Judicial Ctr., *Manual for Complex Litig.* § 30.42 at 240 (3d. ed. 1997)). "Courts may rely on the judgment of experienced counsel on the merits of a class action settlement." *Daniels v. Greenkote IPC, Inc.*, 2013 WL 1890654, at *2 (E.D. Mo. May 6, 2013) (citation omitted). Considering the applicable factors, the Court should grant the settlement final approval.

**I.     THE MERITS OF PLAINTIFFS' CASE WEIGHED AGAINST THE TERMS OF THE SETTLEMENT**

"The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement." *Orden*, 2016 WL 6893814, at *3 (quoting *Marshall*, 787 F.3d at 508). But "[b]ecause the purpose of settlement is to avoid the delay and expense of a trial . . . the Court 'need not resolve all of the underlying disputes, . . . and the value of the settlement need not be determined with absolute precision.'" *In re Tex. Prison Litig.*, 191 F.R.D. 164, 172 (W.D. Mo. 1999) (quoting *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1178 (8th Cir.1995)); *see also White v. Nat'l Football League*, 822 F. Supp. 1389, 1417 (D. Minn. 1993) ("[T]he court[ ] cannot be expected to balance the scales with the nicety of an apothecary. The very object of compromise 'is to avoid the determination of sharply contested and dubious issues.' Thus, the court's determination generally will not go beyond 'an amalgam of delicate balancing, gross approximation, and rough justice.'" (quotations omitted)).

This factor strongly favors final approval of the proposed settlement, which provides for

a substantial, non-reversionary common fund that will reimburse claimants more than they could get at trial under plaintiffs' damages model, while the lawsuit also ended defendant's deceptive practice of overstating the products' value. Under the Settlement, Monsanto will compensate every Authorized Claimant for up to twenty bottles validly claimed per Class Member. Plaintiffs' benefit-of-the-bargain damages model is based on the degree of the products' "underfill," *i.e.*, the number of gallons promised, minus the number actually provided. *See Martin v. Monsanto Co.*, 2017 WL 1115167, at *8 (C.D. Cal. Mar. 24, 2017). It is designed to compensate Class Members for the amount of gallons they did not receive, which ranges from 38.8% to 49.2% of the retail price, and averages about 43%. Monsanto's competing damages model based on a comparison of its sales before and after it removed the "Makes Up to __ Gallons" statement on Concentrate Plus, showed damages of about 11% on average. Fitzgerald Decl. ¶ 5. Under the settlement, however, Authorized Claimants are entitled to approximately 50% refunds prior to any necessary *pro rata* reduction. These amounts exceed the damages estimated under plaintiffs' "underfill" model.

| Roundup Product | Underfill Damages | Per Unit Payment | % of Potential Damages Recovered |
|---|---|---|---|
| Super Concentrate 35.2 fl. oz. | $16.48 | $21 | **127.4%** |
| Super Concentrate 53.7 oz. (0.42 gal.) | $24.27 | $31 | **127.7%** |
| Super Concentrate - 64 fl. oz. (1/2 gal.) | $28.33 | $36 | **127.1%** |
| Super Concentrate - 128 fl. oz. (1 gal.) | $42.13 | $53 | **125.8%** |
| Concentrate Plus 32 oz. (1 qt.) | $9.95 | $11 | **110.6%** |
| Concentrate Plus 36.8 oz. | $11.23 | $11.50 | **102.4%** |
| Concentrate Plus 40 oz. | $12.33 | $13 | **105.4%** |
| Concentrate Plus 64 oz. (1/2 gal.) | $21.91 | $22 | **100.4%** |

*See* Settlement Agreement ¶ F.1; *Martin v. Monsanto Co.*, No. 16-cv-2168-JFW (C.D. Cal.), Dkt. No. 81-4, Declaration of Colin Weir (plaintiff's damages expert), at ¶¶ 41, 48. This weighs in favor of approval. *See Roeser v. Best Buy Co.*, 2015 WL 4094052, at *7 (D. Minn. July 7, 2015)

(factor satisfied where amount claimants received was equal to or more than they could be expected to win at trial); *Wilson v. Gunter*, 21 F.3d 1123, 1994 WL 117480, at *1 (10th Cir. 1994) (affirming district court's approval of settlement based on recommendation of magistrate judge "noting that the agreement probably provided more relief than plaintiffs could expect if they prevailed at trial"); *Braynen v. Nationstar Mortgage, LLC*, 2015 WL 6872519, at *12 (S.D. Fla. Nov. 9, 2015) (granting final approval of class actions settlement where "in many circumstances the Settlement provides the opportunity to recover *more* relief than Class Members could prove at trial" (emphasis in original)); *cf. Charter Commc'ns*, 2005 WL 4045741, at *6 (approving settlement providing anywhere from 32% to more than 100% of the estimated damages, depending on whether recovery could be obtained for some of the disclosure dates at issue, because "[u]nder either scenario, the [s]ettlement [was] well above the average 5.5%-6.2% of estimated losses recovered in securities fraud class [ ] settlements" (citation omitted)).

Significantly, claimants will obtain refunds likely exceeding what they could get at trial, without the further risk or cost that would be attendant to continued litigation, especially in attempting to obtain certification in the remaining 49 states. Unsurprisingly, Monsanto has expressed its intention to zealously oppose any attempts to certify a nationwide class outside the settlement context, and certification of nationwide consumer fraud classes has become at least extremely difficult and, in many cases, impossible. Fitzgerald Decl. ¶ 6.

Monsanto also denies wrongdoing and, if the case goes to trial, intends to vigorously defend against plaintiffs' allegations. To that end, Monsanto asserts reasonable consumers would not likely be misled because the gallons statement says "up to," which is literally true, and the instruction pamphlet explains that the stated number of gallons can be achieved by using the product on "easy to kill" weeds. *See* Fitzgerald Decl. Ex. A, Monsanto's Response to Interrogatory 11 & Ex. B, Guard 30(b)(6) Dep. Tr., at 305:25-307:21; *see also* Dkt. No. 25, at 5-

6 (summarizing Monsanto's motion to dismiss arguments). But even if plaintiffs were able to obtain certification of the remaining 49 states and establish liability at trial, there is no guarantee that their 43% model, rather than Monsanto's 11% model, would prevail.

"These very real dangers that both the plaintiffs and defendants would face if this case were to go forward, strongly indicate that the value of this settlement is substantial and brings real and immediate benefits to the settlement class while they may well not get anything if the case were to go forward or, if they did receive some benefits, may well not receive anything until years into the future after millions of dollars have been spent." *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 2004 WL 3671053, at *10 (W.D. Mo. Apr. 20, 2004); *see also Charter Commc'ns*, 2005 WL 4045741, at *7. And even if the Class could obtain a damages judgement, it would likely be subject to appeal which, even if unsuccessful, would delay the Class's recovery for years. Thus, "[a]s for the first factor, 'the outcome of the litigation would be far from certain' if the case had not settled." *Khoday v. Symantec Corp.*, 2016 WL 1637039, at *5 (D. Minn. Apr. 5, 2016) (quoting *Wireless Fees Litig.*, 396 F.3d at 933), *aff'd sub nom. Caligiuri v. Symantec Corp.*, 855 F.3d 860 (8th Cir. 2017).

"As courts have recognized, when considering settlement agreements they[ ] 'should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere probability of relief in the future, after protracted and expensive litigation." *BankAmerica Corp.*, 210 F.R.D. at 701 (quotation omitted). "In this respect, 'it has been held proper to take the bird in the hand instead of a prospective flock in the bush.'" *Id.* (quotation omitted). In other words, "[i]t is the surety of settlement that makes it a favored policy in dispute resolution as compared to unknown dangers and unforeseen hazards of litigation." *Charter Commc'ns*, 2005 WL 4045741, at *4-5 (quotation and citation omitted). Considering the risks involved in even reaching a damages determination, particularly for the 49 states that have

not been certified, and the additional risk that Class Members' recovery would be reduced from 50% of the products' price, to 11% or less, the Court should find this factor weighs in favor of final approval. *See Khoday*, 2016 WL 1637039, at *5 (factor "favors approving the settlement" where "[a]lthough Plaintiffs survived motions to dismiss [and] a class certification motion . . . they would still have to prevail at trial and contend with any appeals," and "several issues . . . remain[ed] contested, including whether Defendants' purported misrepresentations were material, whether class members suffered damages, and the extent of damages," but the settlement provided "class members submitting valid claims . . . an amount in excess of their out-of-pocket loss"); *Kelly v. Phiten USA, Inc.*, 277 F.R.D. 564, 570 (S.D. Iowa 2011) (factor favored approval where "Class Members would have faced challenges by the Defendant regarding their eligibility for class certification due to choice of law limitations," among other issues, but class counsel "obtained a highly favorable recovery," that was "more than adequate to address claims and expenses").

## II.     THE DEFENDANT'S FINANCIAL CONDITION

Here, although "defendant could likely afford a greater settlement, the result is quite favorable," *see Wiles v. Sw. Bill Tel. Co.*, 2011 WL 2416291, at *3 (W.D. Mo. June 9, 2011) (citation omitted); *see also BankAmerica Corp.*, 210 F.R.D. at 702 ("Although it appears that the defendant bank has the ability to withstand a greater financial judgment . . . given the substantial risks and obstacles faced by the classes in proceeding to trial . . . such factor does not weigh against approving the settlement."); *Simmons v. Enter. Holdings, Inc.*, 2012 WL 718640, at *3 (E.D. Mo. Mar. 6, 2012) (Fleissig, J.) (granting preliminary approval where "[t]here has been no indication that Defendants will be unable to pay, or incur undue hardship as a result of, the settlement"); *Risch v. Natoli Eng'g Co., LLC*, 2012 WL 3242099, at *3 (E.D. Mo. Aug. 7, 2012) (Fleissig, J.) (same); *cf. Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1152 (8th Cir. 1999) ("While it is undisputed

that [defendant] could pay more than it is paying in this settlement, this fact, standing alone, does not render the Settlement inadequate."). Accordingly, at worst this factor is "neutral" because while Monsanto's "good financial standing . . . would permit it to adequately pay for its settlement obligations," it could just as easily use those funds to "continue with a spirited defense in the litigation." *See Marshall*, 787 F.3d at 512; *see also Huyer*, 847 F.3d at 939 (district court did not abuse its discretion in finding that factors "was neutral because Wells Fargo's financial condition was stable"); *Keil v. Lopez*, 862 F.3d 685, 697 (8th Cir. 2017) (factor neutral where there was "no evidence in the record calling [defendant's] financial condition into question").

### III.  THE COMPLEXITY AND EXPENSE OF FURTHER LITIGATION

"Class actions, in general, place an enormous burden of costs and expense upon parties." *Keil*, 862 F.3d at 698 (quoting *Marshall*, 787 F.3d at 512). "In addition, . . . [Monsanto] has alleged numerous legal and factual defenses that, absent settlement, will require full discovery, including numerous depositions, briefing, and additional pre-trial work." *See id.* Further "expert discovery, and summary judgment motions are just a few of the matters that would ensue, in addition to a trial and possible appeals." *Id.*; *see also Kelly*, 277 F.R.D. at 571 (approving settlement where, "[w]ere the Settlement Class Members to receive a favorable trial verdict, they still would have faced costly and lengthy appeals, delaying the receipt of benefits"). "Additional work may also include pre-trial motions, post-trial motions, and thousands more hours of attorney time." *Keil*, 862 F.3d at 698; *see also Marshall*, 787 F.3d at 512 ("Where, as here, the class members' claims involve complex legal questions, conflicts of law analyses, [and] the application of numerous states' laws, . . . the enormity of the burden is obvious."). Accordingly, because "Defendant has capable counsel at its disposal and intended to challenge nearly every aspect of Settlement Class Members' case," "the litigation would likely have been long and costly," *Kelly*, 277 F.R.D. at 570.

The Court should therefore find that this factor weighs heavily in favor of final approval

of the Settlement Agreement. *See Keil*, 862 F.3d at 698; *Wiles*, 2011 WL 2416291, at *3 (factor "favors settlement" where "plaintiffs believe that the claims asserted in the litigation have merit," but "class counsel recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the litigation through summary judgment, class certification and appeals," and "Defendant, while also mindful of the uncertainties of litigation, has aggressively maintained its positions regarding liability and damages"); *Huyer*, 847 F.3d 939 (district court did not err in finding that factor "weighed in favor of approving the settlement" where "proceeding to trial would be costly, extensive discovery was likely, a trial would last ten days to two weeks, and presenting complex financial data to lay jurors would be difficult"); *McGee v. Cont'l Tire N. Am., Inc.*, 2009 WL 539893, at *4 (D.N.J. Mar. 4, 2009) (factor "weigh[ed] heavily in favor of settlement" where defendant "would contest certification of a single nationwide litigation class and that, if it were successful in arguing against the certification of such a class, 'Class Counsel would be left with filing and prosecuting numerous single-state class actions," making "it [ ] clear that litigation of th[e] matter would be time-consuming, uncertain and expensive").

Moreover, "Class counsel's views are entitled to deference, especially since [this Court and] the [California] district court found that they have significant experience in class actions and complex litigation." *See Keil*, 862 F.3d at 698 (citing *DeBoer*, 64 F.3d at 1178); *see also* PA Order at 4 (Settlement Agreement "is the result of serious, informed, non-collusive arms'-length negotiations, involving experienced counsel familiar with the legal and factual issues of this case"); *Martin*, 2017 WL 1115167, at *5 (finding Class Counsel "submitted declarations demonstrating that they have had substantial experience with similar class actions and other false advertising litigation, have no conflicts, and will continue prosecuting the action vigorously on behalf of the Class").

## IV.     THE AMOUNT OF OPPOSITION TO THE SETTLEMENT

The reaction to the settlement has been positive, with only 10 persons opting out (likely because they believed it necessary in the abundance of caution to preserve personal injury rights against Monsanto in light of the ongoing controversy over the contribution of Roundup to cancer), and none filing objections thus far. Moreover, as previously described, each of the plaintiffs from the numerous copycat actions elected to join this action to support the settlement. *See* Dkt. No. 32 at 14 n.5. Accordingly, this factor strongly favors approval. *See Wiles*, 2011 WL 2416291, at *4 ("Having no objectors demonstrates strong support for the value and benefits delivered by the settlement" and so "[t]his factor weighs heavily in favor of approval of the settlement."); *McClean v. Health Sys., Inc.*, 2015 WL 12426091, at *6 (W.D. Mo. June 1, 2015) (finding "final factor strongly favors approval" where "[n]o Class Member filed an objection . . . and only fourteen individuals opted out (.04% of the Class)").

## **CONCLUSION**

For the foregoing reasons, the Court should grant the Motion.


Dated: March 13, 2018                              Respectfully Submitted,


                              By:     */s/ Jack Fitzgerald*

                                      Jack Fitzgerald (*Pro Hac Vice*)
                                      *jack@jackfitzgeraldlaw.com*
                                      THE LAW OFFICE OF JACK FITZGERALD, PC
                                      Hillcrest Professional Building
                                      3636 Fourth Avenue, Suite 202
                                      San Diego, California 92103
                                      Phone: (619) 692-3840
                                      Fax: (619) 362-9555

                                      Sidney W. Jackson, III (*Pro Hac Vice*)
                                      *sid@jacksonfosterlaw.com*
                                      JACKSON & FOSTER, LLC
                                      75 St. Michael Street

        Mobile, Alabama 36602
        Phone: (251) 433-6699
        Fax: (251) 433-6127

        Kevin J. Dolley (# 54132MO)
        *kevin@dolleylaw.com*
        LAW OFFICES OF KEVIN J. DOLLEY, LLC
        2726 S. Brentwood Blvd.
        St. Louis, Missouri 63144
        Phone: (314) 645-4100
        Fax: (314) 736-6216
        (Local Counsel for Plaintiffs)

***Class Counsel***