**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| JOSHUA RAWA, ELISABETH MARTIN, ROBERT RAVENCAMP, AMY WARD, CYNTHIA DAVIES, CHRISTOPHER ABBOTT, OWEN OLSON, JEANNIE A. GILCHRIST, ZACHARY SHOLAR, MATTHEW MYERS, JOHN W. BEARD, JR., and MICHAEL OVERSTREET on behalf of themselves, all others similarly situated, and the general public,<br><br>   Plaintiffs,<br><br>   v.<br><br>MONSANTO COMPANY,<br><br>   Defendant. | Case No.: 4:17-cv-01252-AGF |

**DECLARATION OF JACK FITZGERALD IN SUPPORT OF MOTIONS**
**FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND**
**FOR ATTORNEYS' FEES, COSTS, AND INCENTIVE AWARDS**

I, Jack Fitzgerald, declare:

1.      I am a member in good standing of the State Bars of California and New York; and of the United States District Courts for the Northern, Central, and Southern Districts of California, the Southern and Eastern Districts of New York, and the Western District of Wisconsin; and of the United States Court of Appeals for the Ninth Circuit. I make this declaration based on my own personal knowledge, in support of plaintiffs' motions for final approval and for attorneys' fees, costs, and incentive awards.

**Information Relevant to Final Approval**

2.      Given the size of this settlement, that it involves a product with a household name (Roundup) and the value of the potential payments Class Members can claim under the settlement (particularly on larger packages), the parties and Dahl recognized a potential for fraudulent claims. Due diligence in evaluating claims for fraud has been especially important here given an

inordinate number of claims regarding the largest package, with the largest potential dollar payout, for which there were 363,894 claims totaling $19,286,382. Although the 128 oz. Super Concentrate comprised only approximately 15.8% of the sales at issue during the relevant period, it accounts for over 70% of the value of the claims made ($19,286,382 of the $27,416,595 worth of claims). Given the amount of product that could be made from a concentrated bottle of this size, of course, there is a reasonable limit on the number of bottles that the average consumer could reasonably be expected to purchase during the applicable statute of limitations.

3.      At a 50% refund, this implies valid claims of $10.6 million worth, out of the $164 million at issue for the Class, or a claims rate of 6.5%, which is expected to increase with the validation of additional claims.

4.      To assist Dahl in identifying and combating fraud, we worked with Monsanto to gather and provide to Dahl certain information that would allow Dahl to make reasonable "cross-checks" on the validity of claims. For example, we provided Dahl with a breakdown of the sales of the products by size, so that Dahl could detect where claims might be out of proportion to sales. We also provided information on which SKUs were *not* sold in particular states or retailers at particular times. This was most true of the 128 oz. Super Concentrate, for which the largest refund, $53 per unit, is available. While this SKU comprised 15.8% of sales, 48.6% of the units claimed were for this size.

5.      In response to Ms. Martin's motion for class certification in California, Monsanto presented the Declaration of Robin Cantor, an economist, who, among other things, compared the sales of Roundup Concentrate Plus before and after Monsanto had removed the challenged "Makes Up to __ Gallons" statement. *See Martin v. Monsanto Co.*, No. 16-cv-2168-JFW (C.D. Cal.), Dkt. No. 58-9. Although the publicly-filed declaration is redacted because it reflects sales data, we independently calculated based on her data, a damages model whose weighted average

- 2 -

would return 10.67% of the price of the products to purchasers. We frequently referred to this figure (as "11%") during settlement discussions.

6.      In discussing settlement and this action more generally, Monsanto has expressed its intention to zealously oppose any attempts to certify a nationwide class outside the settlement context. In my experience, in recent years, certification of nationwide consumer fraud classes has become at least extremely difficult and, in many cases, impossible.

7.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of Monsanto's response to plaintiff Elisabeth Martin's response to Interrogatory No. 11.

8.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of excerpts of the transcript of the January 27, 2017 deposition of Monsanto, given pursuant to Rule 30(b)(6) by Jim Guard ("Guard 30(b)(6) Dep. Tr.").

### Time Billed by Class Counsel

9.      The Law Office of Jack Fitzgerald, PC ("LOJF") was formed in April 2013 and dedicates its practice almost entirely to prosecuting class action lawsuits. LOJF's practice is to keep contemporaneous records for each timekeeper, and to regularly record time records in the normal course of business. Moreover, LOFJ's practice is to bill in 6-minute (tenth-of-an-hour) increments. Each timekeeper kept time records in this case consistent with these practices. LOJF's billing records are voluminous, but can be provided for review, along with billing rates, at the Court's request.

10.      Prior to tallying LOJF's hours, we reviewed our billing records and made cuts for time entry errors, duplications, and instances where we determined the hours should be reduced or not billed. Co-Class Counsel, Sidney W. Jackson, III of Jackson & Foster LLC, similarly reviewed his hours and provided his billing records to my firm.

11.      The total time spent by Class Counsel on this matter through March 12, 2018 is

1,703.0 hours. This does not include any work performed finalizing and filing the motions for final approval and for attorneys' fees, costs, and service awards, work responding to any objections, and work preparing for and attending the final approval hearing.

### Time Billed by Counsel in the Related Actions

12.     The attorneys that represented the plaintiffs in the related actions also sent their finalized billing and expense records to my office. We reviewed these records and made similar cuts for work and expenses we believed should not be counted. The total hours worked by these firms is set forth in the following table.

| Firm | Case | Hours |
|------|------|-------|
| Shank & Moore, LLC | *Ravencamp v. Monsanto Company*, No. 1716-CV0336, Division 12 (Circuit Court of Jackson County, Missouri, at Independence) | 101.1 |
| Rapier Law Firm | *Ward v. Monsanto Company*, Case No. 1:17-cv-03335 (N.D. Ill.); *Abbott v. Monsanto Company*, Case No. 3:17-cv-00315 (W.D. Ky.); *Olson v. Monsanto Company*, Case No. 1:17-cv-01333 (D. Colo.); *Gilchrist v. Monsanto Company*, Case No. 5:17-cv-266 (E.D.N.C.); *Sholar v. Monsanto*, No. 4:17-cv-00100 (S.D. Ind.); *Overstreet v. Monsanto Company*, Case No. 2:17-cv-2740 (E.D. Penn.) | 509.3 |
| Finn & Yeoman | *Abbott v. Monsanto Company*, Case No. 3:17-cv-00315 (W.D. Ky.); *Gilchrist v. Monsanto Company*, Case No. 5:17-cv-266 (E.D.N.C.); *Sholar v. Monsanto*, No. 4:17-cv-00100 (S.D. Ind.); *Overstreet v. Monsanto Company*, Case No. 2:17-cv-2740 (E.D. Penn.) | 132.0 |
| Patrick Beard Schulman and Jacoway, PC | *Myers v. Monsanto Company*, Case No. 1:17-cv-02045 (N.D. Ga.); *Beard et al v. Monsanto Company*, Case No. 1:17-cv-00171 (E.D. Tenn.) | 76.8 |
| McClain DeWees, PLLC | *Sholar v. Monsanto Company*, No. 4:17-cv-00100 (S.D. Ind.) | 34.4 |
| Pritchett & Burch, PLLC | *Gilchrist v. Monsanto Company*, Case No. 5:17-cv-266 (E.D.N.C.) | 22.2 |
| Patterson Law Firm, LLP | *Myers v. Monsanto Company*, Case No. 1:17-cv-02045 (N.D. Ga.) | 17.5 |
| | **Total =** | **893.3** |

**Costs Necessary for the Prosecution of this Action**

13.     LOJF also incurred $83,928.98 in costs that were reasonably necessary for the successful prosecution of this action (LOJF does not, however, seek reimbursement for regular and overnight postage, working meals, photocopying, legal research, and PACER charges). LOJF also wrote off non-refundable travel and accommodation expenses incurred by an attorney that twice did not attend the mediation, as expected. The costs incurred by LOJF are as follows:

| Description | Amount |
|---|---|
| Investigation Expenses | $260.16 |
| Expert Witness Fees | $46,403.18 |
| Mediation | $14,361.46 |
| Filing & *Pro Hac Vice* Fees | $1,030.00 |
| Service Fees (including Chambers Copies) | $5,136.46 |
| Depositions | $8,959.55 |
| Travel | $4,526.76 |
| Meals While Traveling | $306.41 |
| Deadlines.com (calendaring software), life of case | $180.00 |
| Local Counsel Expenses | $2,765.00 |
| **Subtotal** | **$83,928.98** |

14.     Jackson & Foster incurred $9,570.65 in costs that were reasonably necessary for the successful prosecution of this action, as follows:

| Description | Amount |
|---|---|
| Investigation Expenses | $155.84 |
| Travel | $6,753.45 |
| Meals While Traveling | $405.59 |
| *Pro Hac Vice* Fees | $100 |
| Mediation | $1,155.77 |
| Local Counsel Expenses | $1,000.00 |
| **Subtotal** | **$9,570.65** |

15.     The attorneys that represented the plaintiffs in the related actions also incurred

filing fees and other expenses in connection with plaintiffs' original actions, totaling $4,114.29. After making cuts for photocopy, legal research, and other expenses we are electing not to bill, those firms incurred expenses as follows.

| Firm | Case | Expenses |
|---|---|---|
| Shank & Moore, LLC | *Ravencamp v. Monsanto Company*, No. 1716-CV0336, Division 12 (Circuit Court of Jackson County, Missouri, at Independence) | $269.85 |
| Rapier Law Firm | *Ward v. Monsanto Company*, Case No. 1:17-cv-03335 (N.D. Ill.); *Abbott v. Monsanto Company*, Case No. 3:17-cv-00315 (W.D. Ky.); *Olson v. Monsanto Company*, Case No. 1:17-cv-01333 (D. Colo.); *Gilchrist v. Monsanto Company*, Case No. 5:17-cv-266 (E.D.N.C.); *Sholar v. Monsanto*, No. 4:17-cv-00100 (S.D. Ind.); *Overstreet v. Monsanto Company*, Case No. 2:17-cv-2740 (E.D. Penn.) | $616.00 |
| Finn & Yeoman | *Abbott v. Monsanto Company*, Case No. 3:17-cv-00315 (W.D. Ky.); *Gilchrist v. Monsanto Company*, Case No. 5:17-cv-266 (E.D.N.C.); *Sholar v. Monsanto*, No. 4:17-cv-00100 (S.D. Ind.); *Overstreet v. Monsanto Company*, Case No. 2:17-cv-2740 (E.D. Penn.) | $1,440.34 |
| Patrick Beard Schulman and Jacoway, PC | *Myers v. Monsanto Company*, Case No. 1:l7-cv-02045 (N.D. Ga.); *Beard et al v. Monsanto Company*, Case No. 1:l 7-cv-00171 (E.D. Tenn.) | $988.10 |
| McClain DeWees, PLLC | *Sholar v. Monsanto Company*, No. 4:17-cv-00100 (S.D. Ind.) | $400.00 |
| Pritchett & Burch, PLLC | *Gilchrist v. Monsanto Company*, Case No. 5:17-cv-266 (E.D.N.C.) | $400.00 |
| | Total = | $4,114.29 |

**Information Relating to Time Limitations Imposed**

16.     The Central District of California has a local rule requiring "the proponent of the class . . . file a motion for certification that the action is maintainable as a class action" "[w]ithin 90 days after service" of the complaint, "unless otherwise ordered by the Court." C.D. Cal. Civ. L. R. 23-3.  Although LOJF normally seeks an extension of the 90-day deadline almost as a matter of course in class actions filed in the Central District of California, because Judge Walter is known

to strictly enforce this rule, we instead committed to meeting this ambitious deadline, for fear of prejudicing the Class's ability to obtain certification.

17.     A detailed recitation of the discovery Class Counsel conducted was set forth in paragraphs 48 to 75 of my declaration supporting Ms. Martin's class certification motion. Relevant excerpts from the declaration (*Martin* Docket No. 51-3) are attached hereto as <u>Exhibit C</u>.

18.     We used the information obtained in discovery to support Ms. Martin's certification motion, filed on February 6, 2017, including to aid its damages expert, Colin B. Weir, in providing a detailed damages model. *See Martin* Dkt. No. 51-16 (Declaration of Colin B. Weir). While Monsanto prepared its opposition, we continued to vigorously pursue discovery, obtaining additional sales data from Lowe's and Amazon.com, and coordinating with Mr. Weir to provide an updated damages estimate. We also prepared both Mr. Weir and Ms. Martin for their depositions and defended the same on February 9 and February 10, 2017, respectively.

19.     Just two days before Ms. Martin's reply in support of class certification was due, on Saturday, February 25, 2017, Monsanto produced several thousand consumer complaints about Roundup Concentrate Plus, which Monsanto had located in responding to a motion to compel plaintiff had filed earlier. Class Counsel reviewed these complaints, incorporating them into the Reply to refute Monsanto's key defenses against class certification.

<u>**Information Relating to the Undesirability of the Case**</u>

20.     My co-counsel, Mr. Jackson, approached me with this case in the summer of 2016, after having been referred by a large plaintiffs' firm with which I had previously worked. I understand from Mr. Jackson that, prior to my agreeing to prosecute the case with him, four large plaintiffs' firms (including the referring firm) declined to pursue the case. After we filed the case, we approached a fifth firm to discuss obtaining potential assistance, but that firm also declined to

join us. These five firms included one in Mobile, Alabama, with experience in class actions and complex litigation; one of the oldest and largest plaintiff's firms whose practice centers around class actions, based in Dallas, Texas, but with locations in 5 other cities; a Chicago, Illinois firm with over 30 years of complex litigation and class action experience; a nationwide firm that is among the largest representing only plaintiffs, with a prominent class action practice; and a Los Angeles, California firm with over 25 years prosecuting class actions and other complex litigation throughout the country. Each of these law firms declined to join Class Counsel in the prosecution of this matter.

### Information Relating to Plaintiff Elisabeth Martin's Prior Relationship with Class Counsel, and Involvement in the Action

21.     Prior to consulting with Ms. Elisabeth Martin regarding this action, Class Counsel had no preexisting relationship with her.

22.     Throughout the course of investigating and prosecuting this action, Ms. Martin has stayed abreast of the litigation and in communication with Class Counsel.

23.     After retaining Class Counsel, Ms. Martin participated in a detailed phone interview to assist in drafting the complaint filed in *Martin v. Monsanto Co.*, No. 5:16-cv-02168-JFW (SPx). She thereafter reviewed a draft of the complaint to ensure that the allegations were as complete and accurate as possible, and signed a Venue Affidavit. She also reviewed the demand letter sent to Monsanto on her behalf.

24.     Later, Ms. Martin also reviewed a draft First Amended Complaint to ensure that certain proposed changes were accurate and complete.

25.     Ms. Martin also reviewed materials regarding Alternative Dispute Resolution, and participated in a phone call with Class Counsel to discuss the various options.

26.     Ms. Martin stayed in contact with Class Counsel regarding discovery issues,

providing proposed dates for her deposition upon request, and staying in touch to propose alternate dates when Monsanto expressed a desire to depose her after certain discovery responses had been served.

27.    On February 10, 2017, Ms. Martin sat for her deposition, which lasted approximately 5.5 hours (commencing at 9:10 am and concluding at 2:49 pm).

28.    Ms. Martin also assisted in responding to discovery requests, including 33 document requests and 10 interrogatories. She spent a considerable amount of time reviewing the requests to familiarize herself with them, participating in a phone call with Class Counsel to discuss what information she might have, and searching her home and computer for information and documents responsive to Monsanto's requests. During this process, Ms. Martin stayed in touch with Class Counsel, answering questions as they arose. Ms. Martin also reviewed drafts of the discovery responses to make sure the answers were compete and accurate.

29.    Lastly, Ms. Martin reviewed and carefully considered the terms of the Settlement and determined them to be in the best interests of the Class, prior to approving the Settlement.

### **CAFA Notice**

30.    I am informed and have seen evidence that Monsanto provided notice of the settlement to the state Attorney Generals in compliance with 28 U.S.C. § 1715, and am informed by Monsanto that no state Attorney General has indicated any issue or concern with the settlement, or otherwise indicated any objection or intent to object.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Signed this 13th day of March, 2018, in San Diego, California.

/s/ Jack Fitzgerald<br>
Jack Fitzgerald

# Exhibit A

1  Stephen R. Smerek (SBN: 208343)
   ssmerek@winston.com
2  **WINSTON & STRAWN LLP**
   333 S. Grand Avenue
3  Los Angeles, CA 90071-1543
   Telephone: (213) 615-1735
4  Facsimile: (213) 615-1750

5  George C. Lombardi (admitted *pro hac vice*)
   glombardi@winston.com
6  **WINSTON & STRAWN LLP**
   35 W. Wacker Drive
7  Chicago, IL 60601
   Telephone: (312) 558-5600
8  Facsimile:  (312) 558-5700

9  John J. Rosenthal (admitted *pro hac vice*)
   jrosenthal@winston.com
10 Adam S. Nadelhaft (admitted *pro hac vice*)
   anadelhaft@winston.com
11 **WINSTON & STRAWN LLP**
   1700 K Street, N.W.
12 Washington, D.C.  20006-3817
   Telephone: (202) 282-5785
13 Facsimile:  (202) 282-5100

14
15 Attorneys for Defendant
   MONSANTO COMPANY

16

17              **UNITED STATES DISTRICT COURT**

18              **CENTRAL DISTRICT OF CALIFORNIA**

19 ELISABETH MARTIN, on behalf of          )   **Case No. 5:16-cv-02168-JFW-SP**
   herself, all others similarly situated, and )
20 the general public,                      )   [Assigned to the Honorable John F.
                                            )   Walter]
21                                          )
                 Plaintiff,                 )   **DEFENDANT MONSANTO**
22                                          )   **COMPANY'S OBJECTIONS AND**
        v.                                  )   **ANSWERS TO PLAINTIFF'S FIRST**
23                                          )   **SET OF INTERROGATORIES**
   MONSANTO COMPANY,                        )
24                                          )
                 Defendant.                 )
25                                          )
                                            )
26 _____ )

27

28

_____

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

Roundup® Concentrate Plus achieves visible results in 12 hours, while Roundup® Super Concentrate achieves visible results in 4 days.  Roundup® Concentrate Plus cannot be used around edibles.  On the directions for use, Roundup® Concentrate Plus instructs that dilution for "best results" is 6 fluid ounces per gallon of water, and for "easy to kill" weeds it instructs 3 fluid ounces per gallon of water.  For Roundup® Super Concentrate, on the directions for use, it instructs that dilution for "best results" is 2.5 fluid ounces per gallon of water, and for "easy to kill" weeds, it instructs 1.5 fluid ounces per gallon of water.

The products also come in different packages.  Roundup® Super Concentrate is in purple packaging, while Roundup® Concentrate Plus is in red packaging.  They also come in different sizes:

Roundup® Super Concentrate – 35.2 oz.

Roundup® Super Concentrate – 0.42 gal.

Roundup® Super Concentrate –1 gal.

Roundup® Super Concentrate –1/2 gal.

Roundup® Concentrate Plus – 6 oz.

Roundup® Concentrate Plus – 40 oz.

Roundup® Concentrate Plus – 36.8 oz.

Roundup® Concentrate Plus – 1/2 gal.

Roundup® Concentrate Plus – 32 oz.

**Interrogatory No. 11:**  Do YOU expect consumers, prior to or at the time they purchase the ACCUSED PRODUCTS, to understand that the CHALLENGED CLAIMS refer to the amount provided if the product is used only to treat weed "seedlings," as stated in the instruction pamphlet and, if so, how do you expect consumers to understand this prior to or at the time they purchase the ACCUSED PRODUCTS?

**Objection:**  Monsanto objects to this Interrogatory as being a premature

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

contention interrogatory that need not be answered until discovery is "substantially complete."  *Kmiec v. Powerwave Techs. Inc.*, 2014 WL 11512195, at *1 (C.C. Cal. Dec. 2, 2014).  Here, discovery is not set to close until October 3, 2017.

**Answer:**  Subject to any objections, Monsanto states that it would expect consumers to understand prior to purchase that the ACCUSED PRODUCTS could make "up to" the amount of gallons stated on the label, but could also make less, depending on how much a consumer diluted the ACCUSED PRODUCT with water. Monsanto would expect the consumer to understand that less of the ACCUSED PRODUCT would need to be diluted with water for seedlings, before purchase, by reading the instruction pamphlet.  The bottle clearly indicates that it is a "resealable label" and it encourages the consumer to "open" the label to see the pamphlet before purchase, which it states in English and Spanish.   Monsanto's expectations are consistent with EPA rules, such as 40 C.F.R. § 156.10(i)(1)(ii), which specifically allows directions for use to be attached to each package or placed within the outside wrapper.

**Interrogatory No. 12:**  Describe in detail YOUR relationship with Scotts as it concerns YOUR ROUNDUP CONCENTRATE business, including by identifying any relevant written agreements, describing the rights and responsibilities of the parties, and describing how the relationship has in fact been implemented, such as the actions either party has taken with respect to the MARKETING, ADVERTISING, and sale of the ROUNDUP CONCENTRATES.

**Objection:**  Monsanto objects to this Interrogatory as being overbroad and seeks information not relevant to the claims or defenses in this case, to the extent it seeks information of Monsanto and Scotts' relationship beyond the ACCUSED PRODUCTS.

**Answer:**   Subject to any objections, Monsanto states that its relationship with Scotts, as it relates to the ACCUSED PRODUCTS is described in the Exclusive

Winston & Strawn LLP
333 South Grand Avenue
Los Angeles, CA 90071-1543

Agency and Marketing Agreement, dated September 30, 1998 (MON-MARTIN 004677), the Amended and Restated Exclusive Agency and Marketing Agreement, dated September 30, 1998 (MON-MARTIN 004839), and the Amendment to the Amended and Restated Exclusive Agency and Marketing Agreement, dated May 15, 2015 (MON-MARTIN 004902).

Dated: January 24, 2017                    WINSTON & STRAWN LLP


                                           By:    */s/ John J. Rosenthal*
                                                  Stephen R. Smerek
                                                  George C. Lombardi
                                                  John J. Rosenthal
                                                  Adam S. Nadelhaft
                                                  Attorneys for Defendant
                                                  MONSANTO COMPANY

DEFENDANT MONSANTO COMPANY'S OBJECTIONS AND ANSWERS
TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
CASE NO. 5:16-CV-2168

**Winston & Strawn LLP**
333 South Grand Avenue
Los Angeles, CA 90071-1543

# Exhibit B

CONFIDENTIAL

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4    ELISABETH MARTIN, on behalf

5    of herself, all others

6    similarly situated, and

7    the general public,

8            Plaintiff,      Case No.

9     vs.                    5:16-cv-02168-JFW(SPx)

10

11    MONSANTO COMPANY,

12              Defendant.

13   _____

14

15

16              *** CONFIDENTIAL ***

17      VIDEOTAPED DEPOSITION OF JIM GUARD

18              CLAYTON, MISSOURI

19          FRIDAY, JANUARY 27, 2017

20

21

22

23   Reported by:

24   DEBORAH HABIAN, MO CCR, IL CSR, RMR, CRR, CLR

25   JOB NO. 118637

CONFIDENTIAL

|  | Page 302 |
|---|---|

1    A.  I'd have to go do the math.  I don't
2  know off the top of my head.
3    Q.  Is the math as simple as just
4  straightforward arithmetic or do you have to do
5  conversions to acid equivalencies and things
6  like that?
7    A.  I think it's pretty straightforward
8  math.
9    Q.  Okay.
10           (Exhibit 29 was marked for
11           ID.)
12  BY MR. FITZGERALD:
13    Q.  I'm handing you what's been marked as
14  Exhibit 29.  This is an e-mail from Chris
15  Enterhar to June Toscano and others, including
16  yourself, dated June 27, 2012.  The subject line
17  is "Home Depot LR actions/notes," and there's an
18  attachment "2013 Roundup line review notes."
19  And then it looks like the third page of this
20  document is that attachment with the title "2013
21  Roundup line review notes" at the top.
22    Do you recognize this?
23    MR. ROSENTHAL:  Can you give me a
24  second to read it?
25    MR. FITZGERALD:  Sure.

|  | Page 303 |
|---|---|

1    MR. ROSENTHAL:  (Reviewing document.)
2    THE WITNESS:  (Reviewing document.)
3  BY MR. FITZGERALD:
4    Q.  Okay.  Have you had a chance to review
5  it?
6    A.  I glanced through it.
7    Q.  Okay.  So just one simple question.  It
8  looks like this reflects what you referred to
9  earlier about the Home Depot buyer, and I think
10  it even refers to Becker on the -- on the
11  attachment, the fourth bullet point up from the
12  bottom.  It says "Becker wants to" -- "wants
13  'makes up to 10 gallons' placed back onto the
14  front of the Roundup core concentrate bottles.
15  This needs to happen for 2013."
16    This is what you were describing
17  earlier?
18    A.  Yes.
19    Q.  On the last page of the e-mail, the
20  page before the attachment, there's a header
21  that says "2013 in-store" with parentheses
22  "Caleb."  Who that referring to?  Do you know?
23  Is that a person, Caleb?
24    A.  Yes.
25    Q.  Who is that?

|  | Page 304 |
|---|---|

1    A.  Caleb was his last name, I believe.
2    Q.  Was it a Home Depot person?
3    A.  I think he was -- he was a Scotts
4  employee.
5    Q.  Okay.  And the first bullet point under
6  there says "Depot liked concept one, DU most."
7    What does "DU" stand for?
8    A.  Display unit.
9    Q.  And then the second sentence after that
10  says "Suggested false bottom for low volume
11  store.  Do you know what that means?
12    A.  Yes.
13    Q.  What does it refer to?
14    A.  A DU will have multiple layers of
15  product.  And so full DU could have a lot of
16  product.  So for stores that have low volume,
17  they'll put an empty box on the bottom and only
18  have maybe two layers.
19    Q.  Okay.  All right.  You can set that
20  aside.
21    A.  (Witness complying.)
22    Q.  All right.  Are you aware of consumers
23  having been actually confused by the "makes up
24  to X gallons" statement on the Roundup
25  concentrates?

|  | Page 305 |
|---|---|

1    A.  I'm aware that we've received a few
2  complaints, yes.
3    Q.  Were you surprised by those complaints?
4    A.  I don't know what my reaction was.
5    Q.  Okay.  How many complaints have you
6  received?
7    A.  Very few.  I don't know the exact
8  number.
9    Q.  Do you know if Scotts has received any
10  such complaints?
11    A.  I do.
12    Q.  And have they?
13    A.  Yes.
14    Q.  How many?
15    A.  I don't know the exact number.  Again,
16  small quantity.
17    Q.  Is it more than Monsanto's received
18  directly?
19    A.  I don't know.  I'm not sure.
20    Q.  For people who were confused by the
21  label, you think it's appropriate to refund them
22  their money?
23    A.  If they're not satisfied with the
24  product, we would have refunded their money.
25    Q.  And have you yourself read any

CONFIDENTIAL

Page 306

1  complaints from consumers along these lines?
2      A.  Yes.
3      Q.  Okay.  And what -- what did the
4  consumer say?  What did they ask for?
5      A.  They didn't understand how the
6  instructions would make 10 gallons.
7      Q.  And did you find that surprising that
8  somebody might not understand that?
9      A.  Yeah.
10     Q.  Why?
11     A.  Because if they would have read the
12  instructions, they would have understood.
13     Q.  The instructions inside the pamphlet?
14     A.  Yeah.
15     Q.  Okay.  Is there any way somebody would
16  have understood without looking at the pamphlet,
17  just looking at the front label and the back
18  panel?
19     A.  Understood what?
20     Q.  Understood how one would achieve
21  10 gallons for the core product?
22     A.  I don't know how they would -- they may
23  have looked online or at other resources.  I
24  don't know.
25     Q.  Okay.  But just based on the label, the

Page 307

1  front label and the back panel, without opening
2  the pamphlet, is it correct that there's no way
3  to determine that?
4      MR. ROSENTHAL:  Objection as to form.
5      THE WITNESS:  Are you asking me that if
6  they didn't read the directions, how would they
7  know how to mix the product?
8  BY MR. FITZGERALD:
9      Q.  What I'm asking is:  When somebody sees
10  the sticker that says "makes up to 10 gallons,"
11  is there anything on the label that -- other
12  than the pamphlet, anything on the front label
13  or the back panel that would tell them how it
14  makes 10 gallons?
15     A.  When they look at the back label, what
16  we've been calling page 1, they would see that
17  it says "Open for additional directions,"
18  something along those lines.  And I would expect
19  them to open it up and read the directions to
20  understand how they make -- how they mix the
21  product.
22     Q.  Okay.  And I think we asked a similar
23  Interrogatory, and you gave a similar answer in
24  response to that.  Do you remember that?
25     A.  Yes.

Page 308

1      Q.  Okay.  Do you think it's misleading at
2  all that on the wheel it refers to -- under the
3  "how to use" it refers to the high level of
4  dilution, the 6 ounces, but the "makes up to
5  10 gallons" refers to the low level, the
6  3 ounces?
7      MR. ROSENTHAL:  Objection as to form.
8      THE WITNESS:  No.
9  BY MR. FITZGERALD:
10     Q.  Has anybody from Monsanto ever thought
11  that comparing different dilution levels is
12  misleading?
13     A.  I don't know.
14     MR. ROSENTHAL:  Objection as to form.
15         (Exhibit 30 was marked for
16          ID.)
17     MR. FITZGERALD:  While we're doing
18  this, let's take a break to switch the tape.
19     THE VIDEOGRAPHER:  Thank you.
20     At 4:36 p.m. we're going off the
21  record.
22         (Recess taken from 4:36 p.m.
23          to 4:40 p.m.)
24     THE VIDEOGRAPHER:  At 4:40 p.m. we're
25  back on the record in the deposition of Jim

Page 309

1  Guard.
2  BY MR. FITZGERALD:
3      Q.  Mr. Guard, I've handed you what's
4  marked as Exhibit 30.  It bears production
5  MON-MARTIN 4380.  This appears to be an e-mail
6  from Paul Ratliff to Elizabeth Brand and
7  yourself dated May 4, 2012.
8      I know this was some time ago.  Do you
9  remember getting this e-mail?
10     A.  I don't.
11     Q.  So it looks like Mr. Ratliff is linking
12  to a website that Spectracide created where it's
13  comparing its product to other competitors in
14  the marketplace.  And in the second full
15  paragraph he says, "Under the coverage and
16  dilution sections, they compare their lowest or
17  newly emerged weeds rate of 3 ounces per gallon
18  to our for-best-results rate of 6 ounces per
19  gallon.  We also have a 3-ounce per gallon
20  recommendation on our label.  So the comparison
21  they are making is misleading."
22     Do you agree with what he says there?
23  And it looks like there's table down here "Shall
24  we make this comparison"?
25     A.  I would need to see this website link.

78  (Pages 306 to 309)

# Exhibit C

**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD (SBN 257370)
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER (SBN 275423)
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

**JACKSON & FOSTER, LLC**
SIDNEY W. JACKSON, III (admitted *pro hac vice*)
75 St. Michael Street
Mobile, Alabama 36602
Phone: (251) 433-6699
Fax: (251) 433-6127

***Counsel for Plaintiff and the Putative Class***

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| ELISABETH MARTIN, on behalf of herself, all others similarly situated, and the general public,<br><br>Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY,<br><br>Defendant. | Case No.: 5:16-cv-02168-JFW (SPx)<br><br>**DECLARATION OF JACK FITZGERALD IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**REDACTED FOR PUBLIC FILING**<br><br>Date:     March 13, 2017<br>Time:    1:30 p.m.<br>Judge:   Hon. John F. Walter<br>Location: Courtroom 7A, 7th Floor |

**Discovery Obtained & Produced by Plaintiff and Class Counsel in the First 90 Days**

48.     Class Counsel served this action on November 7, 2016, and since then, have been vigorously prosecuting the case. The following describes the discovery Class Counsel and plaintiff have obtained in the first 90 days.

### *Discovery From Monsanto*

49.     After amending the Complaint on November 28 (Dkt. No. 19), Class Counsel secured Monsanto's agreement to conduct the Rule 26(f) conference on December 15, 2016. (*See* Dkt. No. 33 at 1.) That same day, Class Counsel served Monsanto with plaintiff's first set of interrogatories and document requests, and a Rule 30(b)(6) deposition notice.

50.     Plaintiff made her initial disclosures on December 28, 2016, including providing a detailed description of her damages models. A true and correct copy of plaintiff's initial disclosures is attached hereto as Exhibit 54.

51.     On January 17, 2017, Monsanto served its responses to plaintiff's first document requests.

52.     On January 18, plaintiff sent a letter to Monsanto, pursuant to Local Civil Rule 37-1, to request a conference regarding certain deficiencies in its responses, a true and correct copy of which is attached hereto as Exhibit 55.

53.     On January 23, Monsanto produced 7,391 pages of documents.

54.     On January 24, Monsanto served its responses to plaintiff's first interrogatories. That same day, the parties participated in a Local Civil Rule 37-1 meet-and-confer conference regarding the deficiencies in Monsanto's responses and objections to plaintiff's document requests.

55.     On January 25, Monsanto produced 3,839 additional pages of documents.

56.     On January 26, pursuant to a request made by Class Counsel, Monsanto produced native versions of 20 PDF documents that contained comments which, in Monsanto's initial production, were inaccessible.

57.     On January 27, Class Counsel took Monsanto's Rule 30(b)(6) deposition.

*Martin v. Monsanto Company*, Case No. 5:16-cv-02168-JFW (SPx)
DECLARATION OF JACK FITZGERALD IN SUPPORT OF PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION

58.    On January 30, pursuant to a request made by Class Counsel, Monsanto re-produced in color 284 documents that it had previously produced only in black and white (including, for example, some labels and advertising, PowerPoint presentations, etc.).

59.    On January 31, Class Counsel provided Monsanto, pursuant to Local Civil Rule 37-2, with a Joint Brief regarding its motion to compel further production in response to plaintiff's document requests.

60.    On February 2, 2017, Class Counsel sent Monsanto a Local Rule 37-1 letter concerning its failure to produce information in Scott's possession in response to plaintiff's document requests despite that such information is within Monsanto's legal control. A true and correct copy of the letter is attached hereto as <u>Exhibit 56</u>.

### *Discovery From Third-Parties*

61.    On December 15, 2016, plaintiff notified defendant, pursuant to Fed. R. Civ. P. 45(a)(4), of her intent to serve document subpoenas on Information Resources, Inc., a market research company that provides consumer goods scan data, as well as retailers including Home Depot, Lowes, Wal-Mart, Target, Orchard Supply Co., Ace Hardware, Sam's West, Tractor Supply Co., Sears, Kmart, and Amazon.com. Attached hereto as <u>Exhibit 57</u> is a true and correct copy of plaintiff's notice of intent to serve subpoenas, which attaches the subpoenas themselves. Class Counsel proceeded to serve these document subpoenas, and has received a substantial amount of sales information in response.

62.    In identifying the relevant data, plaintiff starts with Monsanto's response to Interrogatory No. 7 (*see* Ex. 11 at 11-13), which identifies the following "first print" dates for the labels containing the challenged gallons claim, and dates the claim was removed from the label of Concentrate Plus.

| Product | Date of First Print | Date Claim Removed From Label |
|---|---|---|
| Super Concentrate 35.2 fl. oz. | January 10, 2013 | *Not Removed* |
| Super Concentrate 53.7 oz. (0.42 gal.) | February 3, 2013 | *Not Removed* |

*Martin v. Monsanto Company*, Case No. 5:16-cv-02168-JFW (SPx)
DECLARATION OF JACK FITZGERALD IN SUPPORT OF PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION

| Super Concentrate 64 fl. oz. (½ gal.) | April 2, 2013 | *Not Removed* |
| Super Concentrate 128 fl. oz. (1 gal.) | January 2, 2013 | *Not Removed* |
| Concentrate Plus 32 oz. (1 qt.) | December 15, 2012 | May 23, 2014 |
| Concentrate Plus 36.8 oz. | December 15, 2012 | May 23, 2014 |
| Concentrate Plus 40 oz. | January 10, 2013 | April 27, 2015 |
| Concentrate Plus 53.7 oz. (0.42 gal.) | | |
| Concentrate Plus 64 oz. (½ gal.) | December 15, 2012 | May 23, 2014 |
| Concentrate Plus 128 oz. (1 gal.) | | |

Because sales of products with the challenged labels likely would have begun some weeks or months after the challenged label was first printed, and since the first print date of all products was in late 2012 or early 2013, for purposes of illustrating plaintiff's damages model, we assume a <u>sales period of January 1, 2013 to the present for Super Concentrate 35.2 oz. and 128 oz. Products, February 1, 2013 to the present for Super Concentrate 53.7 oz., and April 1, 2013 for Super Concentrate 64 oz.</u> For the Concentrate Plus products, while Monsanto avers that a business decision was made to remove the claim in May 2014, the EPA paperwork shows the new labels were not approved until late 2014, so we assume <u>sales period of January 1, 2013 through the end of 2014 for Concentrate Plus.</u> We expect to be able to more precisely identify the relevant time periods the challenged labels were sold in short order, through information obtained from Scotts, for example.

**Ace Hardware**

63.     On January 26, 2017, Ace Hardware produced a Microsoft Excel spreadsheet containing unit and dollar sales data for sales of the Roundup Concentrates made during the relevant time period in 308 stores throughout California.

64.     Those data show 74,590 units of the class products sold for total sales of $2,241,240.77, at a cost to Ace of $1,838,656.04, representing a 21.8% retail markup.

| **Product** | **Units** | **Total Sales** | **Avg. Retail Price** |
| Super Concentrate 35.2 oz. | 17,969 | $825,837.31 | $45.96 |

15

| Product | Units | Total Sales | Avg. Retail Price |
|---|---|---|---|
| Concentrate Plus 32 oz. | 4 | $90.29 | $20.57 |
| Concentrate Plus 36.8 oz. | 24,453 | $585,365.49 | $23.94 |
| Concentrate Plus 40 oz. | 1 | $26.99 | $26.99 |
| *Totals =* | *77,209* | *$2,241,240.77* | |

65.     Ace also produced a Microsoft Excel spreadsheet titled "Roundup Customers CA Stores.xlsx," containing a list of 51,337 Ace Rewards Member Customers in California who purchased the products during the class period, including names, addresses, phone numbers, email addresses, dates of purchase, units purchased, and price paid.

66.     A true a correct copy of Ace's January 26, 2017 response letter is attached hereto as <u>Exhibit 58</u>. Plaintiff provided Ace's production to Monsanto shortly after receiving it.

**Home Depot**

67.     After several meet-and-confer discussions with Home Depot's counsel, on February 2, 2017, Class Counsel obtained from Home Depot sales transaction data for the products at issue, arranged by UPC, from 2012 to 2016. A true and correct copy of the documents produced by Home Depot, bearing production numbers HDUSA1-6, is attached hereto as <u>Exhibit 59</u>. Because Home Depot designated this information "HIGHLY CONFIDENTIAL" under the Protective Order, plaintiff is moving to file it under seal. Plaintiff provided Home Depot's production to Monsanto shortly after receiving it.

68.     Home Depot's data show, during the relevant time period, the following unit and dollar sales, and average retail prices, for the following products.

| Product | UPC | Units | Total Sales | Avg. Retail Price |
|---|---|---|---|---|
| Super Concentrate 128 oz. | 500420 | ■■■■ | ■■■■■■ | $107.27 |
| Super Concentrate 64 oz. | 500857 | ■■■■ | ■■■■■■ | $73.65 |
| Concentrate Plus 32 oz. | 500505 | ■■■■ | ■■■■■■ | $21.49 |

16

*Martin v. Monsanto Company*, Case No. 5:16-cv-02168-JFW (SPx)
DECLARATION OF JACK FITZGERALD IN SUPPORT OF PLAINTIFF'S MOTION
FOR CLASS CERTIFICATION

| Product | UPC | Units | Total Sales | Avg. Retail Price |
|---|---|---|---|---|
| Concentrate Plus 64 oz.[5] | 500604 | ███ | █████ | $45.07 |
| *Totals* = | | ███ | █████ | |

**Lowes**

69.     After meeting-and-conferring with Lowes' counsel, on February 6, 2017, Class Counsel obtained from Lowes transaction purchase histories for four Roundup Concentrate items (Super Concentrate 35.2 oz. and Concentrate Plus 32, 64, and 128 oz.), in the form of four pdfs that are 314 pages, 742 pages, 2,165 pages, and 4,777 pages, respectively. These documents also identify thousands of purchasers, including in many cases, their names, mailing addresses, and email addresses. Attached hereto as <u>Exhibit 60</u> is a true and correct copy of Lowe's production letter. Plaintiff provided Lowes' production to Monsanto shortly after receiving it.

70.     Unfortunately, there is no easy to way to use pdf files to tally unit and dollar sales during appropriate time periods, as pdf documents do not allow the selection of a given column. Class Counsel requested, but Lowes has not yet provided native Microsoft Excel spreadsheets corresponding to these documents. Accordingly, while we expect to be able to use this data in calculating the class's damages, we do not include the data for purposes of the present analysis.

**Wal-Mart**

71.     After meeting-and-conferring with Lowes' counsel, on February 6, 2017, Class Counsel obtained from Wal-Mart weekly unit and dollar sales data from September 29, 2012 through December 31 2016, attached hereto as <u>Exhibit 61</u>. Plaintiff provided Wal-Mart's production to Monsanto shortly after receiving it.

---

[5] The page of Home Depot's production bearing production number HDUSA4 inadvertently refers to this as "32 Oz." in the heading, but the UPC reflects it is the 64 oz. size.

17

72.   Wal-Mart's data show the following unit and dollar sales, resulting in the following average retail prices.

| 73.Product | UPC | Units | Total Sales | Avg. Retail Price |
|---|---|---|---|---|
| Super Concentrate 128 oz. | 500420 | ■ | ■ | $96.04 |
| Super Concentrate 35.2 oz. | 510078 | ■ | ■ | $41.69 |
| Concentrate Plus 64 oz. | 500604 | ■ | ■ | $43.47 |
| Concentrate Plus 32 oz. | 500505 | ■ | ■ | $21.27 |
| *Totals =* | | ■ | ■ | |

\*            \*            \*

73.   Summing all the retailer data, the following average retail prices can be determined now.

| Product | # Units | Total Sales | Avg. Retail Price |
|---|---|---|---|
| Super Concentrate 128 oz. | ■ | ■ | $107.05 |
| Super Concentrate 64 oz. | ■ | ■ | $73.65 |
| Super Concentrate 35.2 oz. | ■ | ■ | $44.31 |
| Concentrate Plus 64 oz. | ■ | ■ | $44.85 |
| Concentrate Plus 40 oz. | ▎ | ■ | $26.99 |
| Concentrate Plus 36.8 oz. | ■ | ■ | $23.94 |
| Concentrate Plus 32 oz. | ■ | ■ | $21.46 |
| *Totals =* | *486,251* | *$20,189,360.20* | |

## Other Retailers

74.   Class Counsel is actively pursuing similar information from the remaining retailers on which plaintiff has served document subpoenas.

18

**The Scotts Company**

75.    On February 2, 2017, Class Counsel notified Monsanto of its intent to serve, then sent out for service a document subpoena on The Scotts Company, a true and correct copy of which is attached hereto as <u>Exhibit 62</u>.

### Estimation of the Class's Damages

76.    To determine the class's total aggregate damages, plaintiff will need to calculate aggregate retail sales of the products in California, then multiple those sales by the shortage for each bottle size, or SKU (in other words, the weighted average of the shortage represented by those sales), to calculate the class's total damages.

77.    Although it is early in the litigation and Class Counsel is still collecting information that will help calculate the class's damages with more precision, due to a variety of information produced by Monsanto and third parties, it is possible to make a reasonable estimate now, and otherwise to demonstrate how the class's damages will likely ultimately be calculated with more precision following additional discovery.

78.    California law requires Monsanto to pay a "mill assessment," or tax, on all liquid herbicide sales. To meet this requirement, Scotts provides Monsanto with its sales to the distributors and retailers to whom Scotts sells the products in California (*i.e.*, wholesale sales). Monsanto then identifies the sales for each product, by EPA Registration Number, to the state of California, on a standardized form, which Monsanto produced for most of the relevant quarters. Monsanto also produced native Microsoft Excel spreadsheets that it used to calculate the mill assessments. Each of these spreadsheets includes a tab, or sheet, titled "Tax Calc," or "Tonnage Tax Calc." The Exhibits referenced in the chart below include only this single sheet from each of the native Microsoft Excel spreadsheets referenced, with a footer added to the bottom right-hand side to indicate the production number and sheet title. The mill assessment forms and spreadsheets show the following "invoice," or wholesale sales in California for the Roundup Super Concentrate and Concentrate Plus during the relevant time period. Because all the documents (forms or spreadsheets) cited in the tables below have