# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

JOSHUA RAWA, ELISABETH MARTIN, ROBERT
RAVENCAMP, AMY WARD, CYNTHIA DAVIES,
CHRISTOPHER ABBOTT, OWEN OLSON,
JEANNIE A. GILCHRIST, ZACHARY SHOLAR,
MATTHEW MYERS, JOHN W. BEARD, JR., and
MICHAEL OVERSTREET on behalf of themselves,
all others similarly situated, and the general public,

                Plaintiffs,

      v.

MONSANTO COMPANY,

                Defendant.

Case No. 4:17CV01252 AGF

*Consolidated with Martin v. Monsanto,
Case No. 4:17CV02300 AGF*

## <u>MEMORANDUM AND ORDER</u>
## <u>GRANTING FINAL APPROVAL OF CLASS SETTLEMENT</u>

This consumer class action came before the Court for a hearing on April 17, 2018,
on Plaintiffs' motion for approval of a nationwide class settlement, and on Plaintiffs'
separate motion for attorney's fees, litigation costs, and service awards for class
representatives. Counsel for the parties and for Objector James Migliaccio appeared in
person; a representative of the Claims Administrator appeared by telephone. Defendant
Monsanto Company ("Monsanto") consents to the motion to approve the settlement, and
opposes the amount of attorney's fees requested. For the reasons set forth below, the
class will be certified and the settlement agreement will be approved, with attorney's fees
set at 28% of the settlement fund. The requests for notice and administration cost,

litigation costs, and service awards will be granted, and a modified *cy pres* distribution will be ordered.

## BACKGROUND

In *Rawa v Monsanto Co.*, 4:17CV01252 AGF, filed on April 5, 2017, Plaintiffs claimed that Monsanto engaged in misleading practices by overstating on several of its Roundup Concentrate products' labels, the number of gallons of spray solution the concentrates would make, in violation of the Missouri Merchandising Practices Act ("MMPA"). Briefly, on the front of the containers near the top, a small separate label stated, "Makes Up to" a certain number of gallons. On the back of the containers, a multipage booklet label was attached. On the front of the booklet label was a symbol indicating that the label could be peeled back, with the instruction, "OPEN," in the top right corner. When the front of the booklet label was peeled back as instructed, the booklet advised as to different dilution options, the least concentrated of which would yield the "up to" amount noted on the front label. Plaintiffs, who were purchasers of the products, sought damages and asserted jurisdiction under the Class Action Fairness Act ("CAFA").

On October 13, 2016, approximately six months before the case was filed here, another putative class action challenging the same practices as to the same products, *Martin v. Monsanto*, 4:17CV2300 AGF, was filed in the Central District of California. *Martin* was brought under the Magnuson Moss Warranty Act ("MMWA"), on behalf of a nationwide class; and under various California consumer protection laws, on behalf of a California subclass. The district court in California denied Monsanto's motion to

dismiss the state law claims for failure to state a claim, and on March 24, 2017, certified a statewide California class with respect to the state law claims. The *Martin* plaintiffs did not seek certification of a class with respect to their MMWA claim. The *Martin* plaintiffs initially estimated that damages for the California class were $22 million, but then corrected the amount to approximately $15.5 million, based on information from Monsanto that a certain product that was included in the damages estimate did not have an offending label.

Plaintiffs' counsel in *Martin* and *Rawa* were the same. On August 22, 2017, in light of a tentative nationwide settlement, the parties in *Martin* jointly requested that *Martin* be transferred to this Court, and on August 23, the California district court granted the motion, finding good cause, in part because "transfer will promote an efficient and economical consideration of the proposed nationwide settlement, and transfer will not affect the substantive rights of the [California] class certified in this action." *Martin*, ECF No. 108.

Upon transfer to this Court, *Martin* was provisionally consolidated with *Rawa* and on September 22, 2017, an Amended Consolidated Class Action Complaint was filed herein. Meanwhile, according to Plaintiffs' counsel's declaration dated October 4, 2017, nine related actions were filed in other states. After the nationwide settlement agreement was reached, Plaintiff's counsel herein reached out to each of the plaintiffs in the nine related actions. All agreed that the nationwide settlement was strong, and worth supporting. Thus, each of these plaintiffs was referred to Plaintiffs' counsel, to be added to the consolidated complaint, and their original actions were dismissed. ECF 32-1 at 3.

The consolidated complaint proposes the following nationwide class:

All persons in the United States, who, during the Class Period,[1] purchased in the United States, for personal or household use certain Roundup Concentrate products whose neck or shoulder label stated that the product "makes up to" a specified number of gallons.

The consolidated complaint alleges that class members would have paid from 40% to 50% less for the concentrate products had they paid the market price for the number of gallons of spray solution actually received. The 12 representative Plaintiffs are from ten states: Missouri, California, Illinois, Kentucky, Colorado, North Carolina, Indiana, Georgia, Tennessee, and Pennsylvania. They include the Plaintiffs in *Rawa*, *Martin*, and the other related cases.

Two causes of action are asserted in the consolidated complaint – one under the MMPA and one under the MMWA. ECF No. 28. On October 4, 2017, Plaintiffs, with Monsanto's consent, moved for preliminary approval of a proposed nationwide class settlement, pursuant to a Settlement Agreement signed that day (ECF No. 32-1 at 7-23), providing for a common fund of $21.5 million. By Order dated December 6, 2017, the Court granted the motion. The Court conditionally certified the proposed class for settlement purposes only (the "Settlement Class"). The Court also approved the parties' selection of a Claims Administrator, approved the form and content of the proposed Class Notice and the proposed method of its dissemination, and set a schedule for the

---

[1] "Class Period" refers to a time period not to exceed the applicable statute of limitations for the false advertising law in the state where each claimant is domiciled, triggered by the date the complaint was filed in *Martin* for California residents, and by the date the complaint was filed in *Rawa* for all other states' residents.

notice period, the opt out and objection periods, and a final approval hearing. ECF No. 41. The approved notice form advised Settlement Class members how to file claims. The notice also advised, among other things, that if funds remained in the common fund after all (valid) claims and expenses were paid, "any remaining amounts will be donated *cy pres* to one or more Court-approved organizations, meaning the remaining funds will be donated to organizations that promote the interests of absent class members." ECF No. 39-1 at 2. The proposed *cy pres* recipients were disclosed on the settlement website.

The Settlement Agreement provides for a payout to an individual claimant of one-half the average retail price of the product(s) he or she purchased. The Settlement Agreement provides that claims are limited to 20 units per household and limits refunds to those who submitted a Claim Form that has been reviewed and validated by the Claims Administrator. Proof of purchase was not required. The Agreement states that the Claims Administrator retained sole discretion in accepting or rejecting a Claim Form. It further provides that payments to claimants are subject to pro-rata reduction, depending on the total valid claims submitted. Class counsel and class representatives were to request fees and service awards to be paid from the common fund, and Monsanto could oppose such requests. And the Agreement states, "Costs for settlement, notice, claims administration, incentive fees, and any other fees, including attorney's fees, will be paid from the Common Fund." ECF No. 32-1 at 15.

The Agreement includes a "quick pay provision," providing that the "the Claims Administrator shall pay to Class Counsel from the Common Fund the amount of attorneys' fees and costs awarded by the Court within seven (7) calendar days of entry of

Judgment, notwithstanding the filing of any appeals, or any other proceedings which may delay the effective date of the settlement or a final judgment in the case . . . ." ECF No. 32-1 at 15.

In support of their motion for approval of the settlement, Plaintiffs assert that the evidence suggests the Settlement Class consists of about 541,000 members. ECF No. 49 at 1 n.2. Extensive and varied notice procedures were employed by the Claims Administrator, as set forth in its March 13, 2018 declaration. The Claims Administrator established a settlement website with general information, important deadlines, and downloadable forms; and established an automated toll-free helpline. The website and helpline number were listed in the over 123,000 mailed and emailed notices sent to potential class members. ECF No. 42-3. In addition, the Claims Administrator implemented print publication notice, keyword search notice, social media notice, and online video and online radio notice. ECF. No. 42-2.

By declaration dated March 23, 2018, the Claims Administrator stated that it had received approximately 94,000 claims. The Claims Administrator disallowed claims for various reasons, including claims filed out of time and beyond the limitations period. "[P]ursuant to its standard practice to evaluate claims to ensure that [claims] are not fraudulent," the Claims Administrator excluded certain claims as fraudulent, such as when multiple claims were filed from the same IP address. Based on its analysis of sales and use data, the Claims Administrator also determined that a disproportionate number of the largest containers – which paid the largest claim amounts – were asserted by some claimants, suggesting fraud. Accordingly, the Claims Administrator excluded

any claims for over 18 bottles for Super Concentrate 53.7 oz., over 16 bottles for Super Concentrate 64 oz., and over 14 bottles for Super Concentrate 128 oz.

According to Plaintiffs' counsel's April 14, 2018 sworn declaration, as of April 13, 2018, this resulted in 70,628 validated claims, valued at $10,774,061, which represents a claims rate of approximately 13%. ECF No. 54-1 at 6. As of March 31, 2018, notice and administration costs were $630,944. *Id.* By separate motion, Plaintiffs seek attorney's fees of one-third of the common fund, which would result in fees of $7,166,666; notice and administration costs which would be approximately the amount noted above; litigation expenses of approximately $97,614; and service awards to the representative Plaintiffs totaling $42,500, including a $10,000 award for the representative Plaintiff in *Martin*.

If the Court were to award the full amount of attorney's fees, litigation expenses, notice and administration costs, and service awards that Plaintiffs have requested, approximately (depending on final amounts of costs and expenses) $2,788,218 of the common fund would remain. The parties have suggested that this remainder be distributed *cy pres* to four recipients: 30% to the National Consumer Law Center ("NCLC"); 30% to the Better Business Bureau's National Advertising Division; 20% to Gateway Greening (a nonprofit that educates and empowers people to strengthen their communities through gardening and urban agriculture in the St. Louis, Missouri, area); and 20% to Kids Gardening (a nonprofit that seeks to improve nutritional attitudes and educational outcomes through garden-based learning, nationally). This suggestion was posted on the settlement website.

Monsanto consents to the motion for final approval of the settlement in all respects except attorney's fees. Monsanto agrees that class counsel is entitled to reasonable attorney's fees from the common fund, but argues for an award of no more than the "standard" 25% of the class fund, which would amount to $5,375,000 in attorney's fees. Monsanto states that while "a great result was achieved" for the Settlement Class, the vast majority of the time spent by class counsel (1,703 hours through March 12, 2018) was limited to a single case that took only a year from the date of filing to a signed settlement agreement, with only two fact and two expert depositions conducted.

According to Plaintiffs, only ten Settlement Class members opted out. Two individuals have filed objections to the Settlement Agreement: James Migliaccio and Patrick Sweeney. Migliaccio is a member of the class from California. In his written objection, he argues that the nationwide Settlement Class should not be certified because the approximately 51,000 California class members are positioned for a greater recovery than class members from other states, because, he contends, California has stronger consumer protection laws. Thus, he argues, the California members received inadequate representation. He further argues that Plaintiffs' counsel made no showing that Missouri law would apply to all proposed class members, and if differing state laws applied, the questions of law or fact common to all class members would not predominate over questions affecting only some members.

Migliaccio also argues that the Claim Administrator's change in the number of bottles of Roundup Concentrate a claimant could claim is an improper "rewriting" of the

Settlement Agreement.  Migliaccio also objects to payment of more than $7 million in attorney's fees for less than a year's work.  He argues that this amount in attorney's fees would result in an average billing rate of approximately $2,700 an hour (adding the hours spent by attorneys in the related cases), and a lodestar disclosure should be required.  Objector Sweeney only objects to the request for attorney's fees, arguing that the fees should be no higher than 25% of the common fund.  He also argues that the quick-pay provision "escalates the natural conflict between class counsel and class members."  ECF No. 48 at 2.

Plaintiffs assert, and the Objectors do not dispute, that Sweeney filed a claim for one bottle of Roundup Concentrate Plus 32 oz., for which he will be issued a refund of $11; and Migliaccio filed a claim for five bottles of Roundup Super Concentrate 35 oz., for which he will be issued a refund of $105.  Plaintiffs argue that Migliaccio's objection to class certification and approval of the settlement should be overruled, in light of a recent Eighth Circuit case, *Keil v. Lopez*, 862 F.3d 685 (8th Cir. 2017) (affirming approval of a nationwide class settlement in a consumer false advertising case), that rejected an argument similar to Migliaccio's based on differing consumer protection laws in different states whose citizens were members of a nationwide class.[2]

---

[2]    Migliaccio states that he is represented by local counsel Peter Woods, but is also represented by Christopher Bandas and Robert Clore, who reserve the right to make an appearance.  ECF No. at 4-5.  Plaintiffs bring to the Court's attention that Bandas and Sweeney are serial or "professional" objectors whose objections numerous courts have found meritless.  ECF No. 49 at 2-7.

With respect to Migliaccio's argument that the Claims Administrator "rewrote" the Settlement Agreement, Plaintiffs first argue that Migliaccio lacks standing to bring this argument because his refund for the five bottles he purchased is unaffected by the change, and more fundamentally, the statement in the Settlement Agreement that claims are limited to 20 units per household does not mean that all claims for 20 units would be honored, regardless of their validity.

Prior to the hearing, the Court required Plaintiffs' counsel to submit detailed billing statements and hourly rates. Counsel submitted unredacted billing records for *in camera* review, as well as redacted records for the parties. The records show a lodestar amount of $1,136,390. ECF No. 54.

At the hearing, counsel for the parties represented that Monsanto has revised its labeling of Roundup concentrate products in response to the *Martin* case and this action. Counsel for the parties and the Claims Administrator described the notice and claims process, including that claimants did not have to provide proofs of purchase. Counsel and the Claims Administrator explained how decisions were made to minimize fraudulent claims. They explained the propensity for fraudulent claims, based on the Claims Administrator's experience, given that no proof of purchase was required, the settlement was announced on various websites, and the recovery level was relatively high. They explained how fraud was detected as to certain claims, based primarily on the volume of claims filed from a single online filing site, the amount of Roundup Concentrate supposedly purchased that exceeded "heavy use" for households (a usage amount based on years of studies and giving the claimants the benefit of the doubt), and

the disproportionate number of claims for the items with the highest refunds. Fraud was also detected in other ways such as claims for purchases from areas where the products were not sold.

In addition to the decision to exclude claims for more than 18, 16, and 14 bottles, respectively, of the three largest products, the Claims Administrator also disallowed a claim in its entirety if it sought a refund for more than 20 bottles. But this only accounted for a small number of disallowed claims, as the vast majority of claims were filed online and the online process did not allow more than 20 units to be claimed.

Plaintiffs' counsel, counsel for Monsanto, and counsel for Migliaccio all presented their respective arguments on all aspects of the case, including the amount of attorney's fees that should be allowed. Counsel for Monsanto represented that Monsanto would not be willing to amend the Settlement Agreement to give claimants more than 50% of the purchase price of the Roundup concentrate they bought, to reduce the *cy pres* remainder. He stated that 50% of the purchase price constitutes at least a 100% recovery, that the term was a material part of the Settlement Agreement, and that an increase would result in a windfall to claimants.

## **DISCUSSION**

### **Settlement Class Certification**

As noted above, the Court conditionally certified the proposed nationwide class for settlement purposes. Final certification is governed by Federal Rule of Civil Procedure 23(b), which provides that class certification is proper only if the four conditions of Rule 23(a) are met and, as relevant here, "the court finds that questions of

law or fact common to class members predominate and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b).  The four conditions of Rule 23(a) are "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *In re Hyundai & Kia Fuel Econ. Litig*., 881 F.3d 679, 690 (9th Cir. 2018).

The Court finds that final class certification under Rule 23 is appropriate because (1) the class members are so numerous that joinder of all class members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims of Plaintiffs as Class Representatives are typical of the claims of the class; and (4) Plaintiffs and their counsel fairly and adequately represent and protect the interests of all Settlement Class members.  Plaintiffs' counsel is competent and experienced in class action litigation, and specifically in litigation involving false and misleading advertising. The fact that some states may have stronger consumer protection laws than others does not undermine the Court's conclusion on any of the four Rule 23(a) requirements, as will be addressed below in assessing the overall fairness of the settlement.

Turning to the requirements of Rule 23(b), the Court concludes that questions of law or fact common to the Settlement Class members predominate over any questions affecting only individual Settlement Class members.  Questions of law and fact common

to the proposed Settlement Class include questions such as whether the claimed "Makes up to" amount of gallons was material to purchasers, whether a reasonable consumer would open the sealed pamphlet on the Roundup Concentrate products that might have alerted the consumer to a different solution yield, and the proper amount of damages. And all proposed Settlement Class members were allegedly subjected to the same misleading and deceptive conduct when they purchased the Roundup Concentrates, and allegedly suffered economic injury because the Roundup Concentrates at issue are misrepresented in the same manner.

Moreover, class treatment is superior to other options for resolution of the controversy because the relief sought for each proposed Settlement Class member is small, such that, absent representative litigation, it would be infeasible for members to redress the wrongs done to them. Thus, the Court grants final certification to the Settlement Class, under Rule 23(a) and (b). The Court reaffirms the Preliminary Approval Order appointing the Plaintiffs as Class Representatives and appointing The Law Office of Jack Fitzgerald, PC, and Jackson and Foster LLC, as well as their current attorneys, as Class Counsel.

**Approval of Nationwide Class Settlement**

"The court's role in reviewing a negotiated class settlement is . . . to ensure that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned." *Keil,* 862 F.3d at 693.

> To determine whether a settlement is "fair, reasonable, and adequate," district courts must analyze . . . four factors . . . (1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the

defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement.

*Id.* (citing *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir.1988)). "The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement." *Van Horn*, 840 F.2d at 607.

### 1. Merits of Plaintiffs' Case Weighed Against the Terms of the Settlement

As for the first factor, the outcome of going to trial would not be certain if the settlement is not approved. Although Plaintiffs survived motions to dismiss their state law claims and prevailed on their motion for class certification in the *Martin* case, they would still have to prevail at trial and contend with any appeals. There are several issues that remain contested, including whether Defendant's purported misrepresentations were material, and the extent of damages. The Settlement Agreement provides for direct benefits to the class, with class members who submitted valid claims receiving an amount equal to or in excess of their out-of-pocket loss. Indeed, the percentage of recovery per unit purchased exceeds the amount of recovery in Plaintiffs' expert damages report, and far exceeds Defendant's damages analysis. In addition, Monsanto changed its labelling in response to the litigation.

This is a strong result in the face of an uncertain trial outcome. Weighing the uncertainty of relief against the immediate benefit in the settlement, as well as the remuneration that equals or exceeds out-of-pocket loss, this factor favors approving the settlement. *See, e.g., Khoday v. Symantec Corp.*, No. 11-CV-180 (JRT/TNL), 2016 WL

1637039, at \*5 (D. Minn. Apr. 5, 2016), *Rep. & Recommendation adopted*, No. 11-CV-0180 (JRT/TNL), 2016 WL 1626836 (D. Minn. Apr. 22, 2016), *aff'd sub nom. Caligiuri v. Symantec Corp.*, 855 F.3d 860 (8th Cir. 2017); *see also Keil*, 862 F.3d at 695-96 (holding that the first factor weighed in favor of approving a nationwide settlement because "although the district court certified the class for purposes of settlement, it is uncertain whether, if the case proceeded to trial, this multistate class of consumers would have created intractable management problems requiring the district court to decertify it").

Further, the amount of the common fund negotiated by Plaintiffs is excellent, providing full recovery for claimants. As noted above, extensive and varied notice procedures were employed by the Claims Administrator, and the claim rate of approximately 13% is quite high, further tipping this factor in favor of approval. *See Keil*, 862 F. 3d at 696 (noting, in discussing first factor, that "a claim rate as low as 3 percent is hardly unusual in consumer class actions and does not suggest unfairness").

## 2. Defendant's Financial Condition

With respect to Monsanto's financial condition, Monsanto voluntarily agreed to the payment amount in the Settlement Agreement, and there is no indication that Monsanto's financial condition would prevent it from making all the payments called for

or any damages awarded following trial. As such, this factor is neutral. *See Marshall v. Nat'l Football League*, 787 F.3d 502, 512 (8th Cir. 2015).[3]

### 3. Complexity and Expense of Further Litigation

Third, the complexity and expense of further litigation could be significant. Plaintiffs are not certain to prevail at trial, with substantial questions posed on issues of materiality and damages. Further, "[c]lass actions, in general, place an enormous burden of costs and expense upon parties." *See id.* Absent approval of the settlement, what remains is one or more trials, perhaps in multiple forums, which are likely to be lengthy and complex, with an unpredictable outcome and post-trial motions and appeals, all while class members remain uncompensated and litigation time, stress, fees, and costs increase for both sides. *See id.*

### 4. Amount of Opposition to the Settlement

Notwithstanding the large size of the Settlement Class and the extensive public notice, there are only two Objectors. The Objectors do not contend that the Settlement Agreement is the product of fraud or collusion. While both Objectors argue that attorney's fees of one-third of the settlement fund are excessive, there is only one objection to the other aspects of the Settlement Agreement. This weighs in favor of approval. *See Keil*, 862 F.3d at 698 (finding that 14 objections where class consisted of

---

[3]    One could argue that Monsanto's financial condition tips in favor of approval, as absent a nationwide settlement, Monsanto has the resources to vigorously litigate the various cases.

approximately 3.5 million households were "miniscule"). It is also telling that the plaintiffs in the related cases all joined in the settlement.

In sum, three factors weigh in favor of approval and one is neutral. The Court further finds that the Settlement Agreement is the result of serious, informed, non-collusive arms-length negotiations, involving experienced counsel familiar with the legal and factual issues of this case.

After careful consideration of the claims process employed, the Court also finds that the Claims Administrator acted properly and within its discretion to accept or decline claims. The Court accepts the Claims Administrator's assessment as to the propensity for fraud, and for the reasons discussed above, finds that the procedures to exclude untimely claims and those deemed fraudulent were reasonable. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 667 (7th Cir. 2015) ("[Courts] can rely, as they have for decades, on claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court to take into account the size of the claims, the cost of the techniques, and an empirical assessment of the likelihood of fraud or inaccuracy.").

Migliaccio's argument based on the fact that the settlement's allocation plan distributes the fund equally among class members of all states, without accounting for the varying strengths of different states' unfair trade practice statutes, is rejected based on the Eighth Circuit's decision in *Keil*, which held that a nationwide class action settlement need not account for differences in state law, and further, that a district court need not consider evidence regarding the valuation of claims under the laws of different

states.  *Keil*, 862 F.3d at 700.  The district court's obligation is "to evaluate the plaintiffs' case in its entirety rather than on a claim-by-claim basis."  *Id*.  Moreover, at the hearing, Migliaccio was unable to identify any material difference between California law and the law of other states that would offer California claimants a greater measure of damages.  The Court also rejects Migliaccio's argument, based on an unsigned and unadmitted statement by another attorney previously involved in *Martin*, that Plaintiffs' counsel had a conflict of interest.

The Court concludes that the settlement is fair, reasonable, and adequate.  The Court will next address the issues of attorney's fees and a *cy pres* distribution.

**Attorney's Fees**

In class action settlement cases,

[c]ourts utilize two main approaches to analyzing a request for attorney fees.  Under the 'lodestar' methodology, the hours expended by an attorney are multiplied by a reasonable hourly rate of compensation so as to produce a fee amount which can be adjusted, up or down, to reflect the individualized characteristics of a given action. Another method, the 'percentage of the benefit' approach, permits an award of fees that is equal to some fraction of the common fund that the attorneys were successful in gathering during the course of the litigation.  It is within the discretion of the district court to choose which method to apply, as well as to determine the resulting amount that constitutes a reasonable award of attorney's fees in a given case. To determine the reasonableness of a fee award under either approach, district courts may consider relevant factors from the twelve factors listed in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 719-20 (5th Cir. 1974).

*Keil,* 862 F.3d at 701 (citations omitted).

A lodestar check can help a court determine if use of percentage of the benefit method results in a reasonable fee award.  *Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir.

2017).  The twelve *Johnson* factors are (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *Johnson*, 488 F.2d at 719-20.

Upon careful consideration of all relevant factors, the parties' arguments, Plaintiff's counsel's billing records, and the case law, specifically in the Eighth Circuit, on attorney's fees in class action settlements, the Court concludes that a fee award of 28% of the common fund is just and reasonable in this case.  This results in an award of $6,020,000.  Among the *Johnson* factors most favoring this award are the novelty and uncertainty of the claims, the skill required by counsel to perform the work properly, especially on a nationwide basis, time limits imposed in the *Martin* case while it was pending in California, the experience and ability of the attorneys, and significantly, the large amount involved and excellent result achieved.  The corresponding lodestar multiplier of 5.3 is still quite high compared to similar cases in this circuit.[4]  *See, e.g.,*

---

[4]   The lodestar multiplier if one third of the common fund were awarded in attorney's fees would be 6.3.  From their fee award, Class counsel will also reimburse the plaintiff's attorneys in the related cases some amount.

*Keil* (approving attorney's fee award of 25% of $32 million settlement fund, with lodestar multiplier of 2.7). The Court does not perceive this award as "penalizing" Plaintiffs' counsel for resolving the case relatively quickly; nor can the amount reasonably be seen as insufficient to entice competent counsel to undertake class action consumer fraud cases.

On the other hand, the Court does not believe this award is too high. Plaintiffs' counsel took on a case with little precedent and handled the *Martin* case in a speedy and efficient manner, including in obtaining class certification within a little over five months of filing the lawsuit. Plaintiffs' counsel negotiated an excellent settlement for the class and promptly and efficiently obtained the approval of the plaintiffs in the similar lawsuits filed in other jurisdiction to join the settlement, rather than pursue protracted proceedings through a multidistrict litigation process. And Plaintiffs' counsel ensured an effective notice process, achieving a 13% claim rate.

In response to Sweeney's conclusory objection, the Court notes that the quick-pay provision will not harm the claimants given the structure of the Settlement. And courts routinely approve quick-pay provisions such as that contained in the Settlement Agreement here. *See, e.g., Pelzer v. Vassalle*, 655 F. App'x 352, 365 (6th Cir. 2016) ("The quick-pay provision does not harm the class members in any discernible way, as the [benefit amounts] available to the class will be the same regardless of when the attorneys get paid."); *In re: Whirlpool Corp. Front–loading Washer Prod. Liab. Litig.*, No. 1:08-WP-65000, 2016 WL 5338012, at *21 (N.D. Ohio Sept. 23, 2016) ("The

essential purpose of a quick-pay clause is to disincentivize lawyers who are 'professional objectors.").

**Notice and Administration Costs, Litigation Costs, and Service Awards**

The Court will award these items in the amounts requested. The Court finds the amounts are reasonable. With respect to the service awards, "[c]ourts often grant service awards to named plaintiffs in class action suits to promote the public policy of encouraging individuals to undertake the responsibility of representative lawsuits," and courts in this circuit regularly grant service awards of $10,000 or greater. *Caligiuri*, 855 F.3d at 867 (citation omitted). The Court approves service awards to the Class Representatives of $10,000 to Elizabeth Martin, $5,000 each to Joshua Rawa and Robert Ravencamp, and $2,500 each to Amy Ward, Cynthia Davies, Christopher Abbott, Owen Olson, Jeannie Gilchrist, Zachary Sholar, Matthew Myers, John Beard, and Michael Overstreet. Although the service award to Martin is sizeable, Martin participated in drafting the complaint in the *Martin* case, reviewed the demand letter sent to Monsanto on her behalf, participated in discovery, and sat for a five and one-half hour deposition in support of the class certification motion. *See* ECF No. 43-2 at 7-9.

Thus, in addition to attorney's fees of $6,020,000, the following amounts will be paid from the common fund: notice and administration costs of $630,944, litigation costs of $97,614, and $42,500 in service awards to the representative Plaintiffs. The Court recognizes that the administration and litigation costs will increase slightly, depending on remaining tasks for the Claims Administrator and Plaintiffs' counsel.

***Cy Pres* Award**

In light of the above rulings, approximately $3,934,881 million will remain in the common fund. In *David P. Oetting, Class Representative v. Green Jacobson, P.C.*, 775 F.3d 1060 (8th Cir. 2015), the Eighth Circuit expressed its concerns, and those of other federal courts, with *cy pres* distributions of unclaimed class action settlement funds. The appellate court discussed with approval the American Law Institute ("ALI") *cy pres* criteria:

> A court may approve a settlement that proposes a cy pres remedy . . . . The court must apply the following criteria in determining whether a cy pres award is appropriate:
>
> (a) If individual class members can be identified through reasonable effort, and the distributions are sufficiently large to make individual distributions economically viable, settlement proceeds should be distributed directly to individual class members.
>
> (b) If the settlement involves individual distributions to class members and funds remain after distributions (because some class members could not be identified or chose not to participate), the settlement should presumptively provide for further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair.
>
> (c) If the court finds that individual distributions are not viable based upon the criteria set forth in subsections (a) and (b), the settlement may utilize a cy pres approach. The court, when feasible, should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class. If, and only if, no recipient whose interest reasonably approximate those being pursued by the class can be identified after thorough investigation and analysis, a court may approve a recipient that does not reasonably approximate the interests being pursued by the class.

*Id*. at 1063-62.

The Eighth Circuit agreed with the Fifth Circuit that "'[b]ecause the settlement funds are the property of the class, a *cy pres* distribution to a third party of unclaimed settlement funds is permissible only when it is not feasible to make further distributions to class members, except where an additional distribution would provide a windfall to class members with liquidated-damages claims that were 100 percent satisfied by the initial distribution.'" *Id*. at 1064 (quoting *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 473-82 (5th Cir. 2011)). The Eighth Circuit noted that a class should be notified of a *cy pres* proposal before a *cy pres* recipient is chosen, and the Court emphasized that "when a district court concludes that a *cy pres* distribution is appropriate . . . such a distribution must be for the next best use . . . for indirect class benefit," and "for uses consistent with the nature of the underlying action and with the judicial function." *Id*. at 1067; *see also Caligiuri*, 855 F.3d at 866-67; *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 682-84 (8th Cir. 2002) (holding that "the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated"). The Eighth Circuit directed that district courts "carefully weigh all considerations, including the geographic scope of the underlying litigation, and make a thorough investigation to determine whether a recipient can be found that most closely approximates the interests of the class." *Id*. (citation omitted).

The Court is not unmindful of criticisms that have been levied against *cy pres* awards in the class action context. *See Marek v. Lane*, 571 U.S. 1003, 134 S. Ct. 8, 9

(2013) (Roberts, J., noting that there exist "fundamental concerns surrounding the use of [*cy pres*] remedies in class action litigation, including when, if ever, such relief should be considered; how to assess its fairness as a general matter; whether new entities may be established as part of such relief; if not, how existing entities should be selected; what the respective roles of the judge and parties are in shaping a *cy pres* remedy; how closely the goals of any enlisted organization must correspond to the interests of the class; and so on"); Martin H. Redish, *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 Fla. L. Rev. 617 (July 2010).

Nonetheless, the Court finds such an award to be appropriate here for several reasons. First, the identification and distribution process was fair and reasonable. The Claims Administrator made proper and extensive efforts to notify potential claimants, resulting in a high claims rate of 13%. The claims process was favorable to claimants, as they could submit claims easily on line, and no proof of purchase was required. Rather than a nominal or nonexistent return to claimants – the source of much of the criticism of *cy pres* awards – claimants are receiving what the parties have reasonably characterized as at least 100% of their damage amounts. In addition, the class action resulted in a further benefit to the class, as Monsanto changed its product labelling.

With regard to the second ALI factor, while a further distribution to claimants is mechanically feasible, the Court concludes that an additional distribution to class members who filed valid claims would provide a windfall to them, as they are already getting the full amount of their out-of-pocket damages by the proposed distribution. And requiring that a windfall be distributed to class members in consumer cases like

this, where class members are not required to provide any proof of purchase, would only serve to encourage fraudulent claims. Of course, the alternative of structuring the settlement in a manner that provides a reversion to the Defendant is even less attractive; here the large settlement fund negotiated by Plaintiffs serves to deter like conduct in the future, which confers an indirect but significant benefit to the class members.

Lastly, the class was notified of a potential *cy pres* distribution, although not of the actual amount, in the notice sent by the Claims Administrator; and was notified of the recipients suggested by the parties, on the settlement website. No class member objected to the concept of a *cy pres* award or to the proposed recipients. In sum, the Court concludes that a *cy pres* distribution of approximately $3.9 million is reasonable.

The Court further concludes that the first two organizations suggested by the parties as *cy pres* recipients are well tailored to the nature of this lawsuit. Furthermore, they are nationwide organizations, as appropriate for a case that involves a nationwide harm. *See In re Airline Ticket*, 3017 F.3d at 683-84. Numerous courts have approved *cy pres* awards to the NCLC in nationwide consumer class actions claiming false advertising. *See, e.g., Miller v. Ghirardelli Chocolate Co*., No. 12-CV-04936-LB, 2015 WL 758094, at *8 (N.D. Cal. Feb. 20, 2015).[5] The Better Business Bureau's National

---

[5]    The court in *Miller* described the NCLC as follows:

> The [NCLC] advocates on behalf of consumers, providing legal services and aid, and representing them on matters of interest before Congress and state legislatures and by filing amicus briefs in courts. In 2009, it published "Consumer Protection in the States: A 50–State Report on Unfair and Deceptive Acts and Practices Statutes," which analyzed and summarized

Advertising Division monitors national advertising in all media for good and services, enforcing high standards of truth and accuracy, and accepts complaints from consumers.

However, as laudable as Gateway Greening and Kids Gardening appear to be, the former serves to benefit only St. Louis residents, and neither charitable organization can fairly be characterized as the "next best use," or addresses the harm alleged, namely, the misleading of consumers.

Accordingly, the Court will order that 50% of the funds available for *cy pres* distribution be paid to the National Consumer Law Center, and 50% paid to the Better Business Bureau's National Advertising Division.

## Notice of Disallowed Claims

The Court does have some concern with respect to the notification process for disallowed claims. At the hearing, the Claims Administrator confirmed that consistent with its normal practices, no notice has been provided to those claimants whose claims were disallowed. Rather, the Claims Administrator intended to post on the website that claims checks had been distributed, advise that the claims of those who had not received a check had likely been disallowed, and provide information for such individuals to make further inquiry of the Claims Administrator. Although the Court, in general, does

the unfair-and-deceptive-acts-and-practices (UDAP) laws that protect consumers in each state and the District of Columbia, spotlighted limitations in these laws and in their enforcement, and made proposals for reform. It also provides help to litigation counsel representing persons with incomes below 200% of the federal poverty line in matters involving consumer sales and services.

*Miller*, 2015 WL 758094, at * 8.

not quarrel with granting the Claims Administrator sole discretion in accepting or rejecting Claim Forms, here the Court believes that some further notice and an opportunity to substantiate a claim should be provided with respect to certain of the disallowed claims. Of primary concern are the non-electronic claims for more than 20 units that were disallowed in their entirety, and those class members whose claims were impacted by the Claims Administrator's exclusion of claims for over 18 bottles for Super Concentrate 53.7 oz., over 16 bottles for Super Concentrate 64 oz., and over 14 bottles for Super Concentrate 128 oz.

Specifically, the Claims Administrator will be required to post on the website the date on which distribution is being made, advise that certain claims have been disallowed, and provide a description of the types of claims disallowed. This notice should advise the class members of the decision to reduce the maximum number of units per household with respect to the larger products. Class members whose claims have been disallowed for reasons such as submitting non-electronic claims for more than 20 units, or submitting claims for more than the reduced number of units of the larger concentrates, should be given at least 60 days from the distribution date to submit tangible proof of their purchases, such as verifiable receipts.

At the hearing, Monsanto recognized that a reserve could be established to cover any previously disallowed claims that might hereafter be allowed by the Claims Administrator based on appropriate proof of purchase. The parties are directed to confer with the Claims Administrator with respect to an appropriate reserve amount, and within fourteen (14) days of the date of this Order, advise the Court of the proposed reserve

amount and proposed procedure and language to notify claimants how they could substantiate disallowed claims.   Once a proposal by the parties is approved by the Court, the Court will dismiss the case and enter judgment.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's Motion for Final Approval of the Class Action Settlement is **GRANTED**, as provided herein.  (ECF No. 42.)

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Attorney Fees, Costs, and Service Awards is **GRANTED in part**, as provided herein.  (ECF No. 43.)

**IT IS FURTHER ORDERED** that the parties and the Claims Administrator shall implement the Settlement Agreement in accordance with its terms and this Court's rulings herein.

Dated this 25th day of May, 2018.

Audrey G. Fleissig
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE